TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-07-00681-CV






Texas School for the Blind and Visually Impaired, Appellant


v.


Mel Dugosh, Individually and as Independent Executor of the Estate of

Christopher Dugosh; and Richard Dugosh, Individually, Appellees (1)






FROM THE PROBATE COURT NO. 1 OF TRAVIS COUNTY

NO. 84515A, HONORABLE GUY S. HERMAN, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 The dispositive issue in this appeal is whether sovereign immunity bars a wrongful-death and survival action arising from the choking death of a resident at the Texas School for
the Blind and Visually Impaired (TSBVI). For the reasons we explain herein, we are compelled to
conclude that it does. Consequently, because the trial court below held to the contrary in denying
a plea to the jurisdiction asserted by TSBVI, we must reverse the court's order denying the plea and
render judgment dismissing the action.



BACKGROUND

 On May 3, 1985, Christopher Dugosh was born with profound developmental defects
that included Cornelia de Lange syndrome (a genetic disorder that can manifest through numerous
physical and intellectual limitations), deformed arms and hands, severe mental retardation,
hearing and vision impairments that his personal physician classified as deafness and blindness,
orthopedic limitations, growth limitations, (2) and various conditions affecting his gastrointestinal tract. 
During Christopher's first eighteen years, his parents, Richard and Mel Dugosh, served as his
primary caregivers, aided by what Richard termed some "off and on" nursing support. On
August 17, 2003, his parents enrolled Christopher at TSBVI, where he lived in a dormitory
environment with other students. Prior to enrollment, Christopher's physician advised TSBVI of
his many medical conditions and warned that Christopher was at risk of "choking." Consequently,
the physician cautioned, Christopher required a "toddler" diet with "no milk, beef, small portions."

 Within a half hour following his evening meal on May 19, 2005--sixteen days
after his twentieth birthday--Christopher began gasping for air, collapsed, and ultimately died. 
Emergency responders who were summoned to the scene reported that they found what appeared
to be pieces of broccoli in Christopher's mouth. A subsequent autopsy revealed that Christopher's
"upper airway was packed with chunks of poorly chewed food material including a portion of the
end of a hot dog measuring 1 inch all around . . . pieces of broccoli measuring up to 1-1/2 inches in
dimension as well as similar pieces of dumplings." Similarly, Christopher's "esophagus was
packed with abundant amount of poorly chewed large portions of broccoli, hot dogs, dumplings and
other solid food material." It is undisputed that TSBVI personnel had given Christopher pieces
of broccoli, hot dog, and french fries (the latter corresponds to the medical examiner's report of
"dumplings") during his evening meal. The medical examiner identified the cause of Christopher's
death as the "result of asphyxia due to choking on bolus [a mass] of food. A contributing condition
is Cornelia de Lange syndrome."

 Mr. and Ms. Dugosh, individually as Christopher's heirs and wrongful-death
beneficiaries, and Mel Dugosh, in her capacity as the independent administrator of Christopher's
estate, (collectively, the Dugoshes) sued TSBVI seeking monetary damages for what they alleged
was negligence or gross negligence of TSBVI personnel that proximately caused Christopher's
death. (3) TSBVI interposed a plea to the jurisdiction asserting that the Dugoshes' claims were barred
by sovereign immunity. In support of its plea, TSBVI advanced two arguments. First, it argued that
the Dugoshes had failed to allege facts that would demonstrate a negligent "condition or use" of
tangible personal property that proximately caused Christopher's death, so as to come within the
waiver of sovereign immunity contained in section 101.021(2) of the civil practice and remedies
code. See Tex. Civ. Prac. & Rem. Code Ann. §§ 101.021(2), .025 (West 2005). Second, TSBVI
argued that the TSBVI employees implicated by the Dugoshes' allegations, and from whom the
institution's liability would derive, were shielded by official immunity under the education code. 
See id. § 101.021(2) (waiver tied to whether governmental unit "would, were it a private person,
be liable to the claimant according to Texas law"); DeWitt v. Harris County, 904 S.W.2d 650,
654 (Tex. 1995).

 With their plea to the jurisdiction, TSBVI moved to dismiss the Dugoshes' claims
under chapter 74 of the civil practice and remedies code, in the view that the Dugoshes' claims were
"health care liability claims" and that the Dugoshes had failed to serve the expert report required by
that chapter. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351 (West 2005 & Supp. 2009).

 Following a hearing in which both sides presented evidence, the probate court denied
both TSBVI's plea to the jurisdiction and its chapter 74 dismissal motion. In its order, the court
included the following pertinent "findings" or conclusions:


1. Plaintiffs have presented facts wherein the condition and the use of tangible
personal property are such that a claim can be made pursuant to the statutory
waiver of sovereign immunity under the Texas Tort Claims Act;


* * *


3. Plaintiffs' claims are not subject to the expert report requirements of Texas
Medical Liability Act; and


4. the immunity provisions set out in Texas Education Code §§ 22.0511 &
22.052 are irrelevant to Plaintiffs' claims as Defendant is not an independent
school district.


This appeal ensued. See id. § 51.014(a)(8), (9) (West 2008).


DISCUSSION

 TSBVI brings three issues on appeal that correspond to the three grounds for
dismissal it urged below. In its third issue, TSBVI argues that the probate court erred in denying its
plea to the jurisdiction because the Dugoshes do not assert that anything constituting a "condition
or use" of tangible personal property proximately caused Christopher's death, so as to come within
the sovereign-immunity waiver of section 101.021(2). In its second issue, TSBVI contends that it
conclusively established that the personnel implicated by the Dugoshes' claims were shielded by
official immunity, thus establishing that it would not be vicariously liable under Texas law for those
actions and thereby negating a waiver under section 101.021(2). Finally, in TSBVI's first issue, it
asserts that the probate court abused its discretion in denying its motion to dismiss under chapter 74
of the civil practice and remedies code. In a cross-point, the Dugoshes assert that the probate court
abused its discretion in excluding certain deposition excerpts they sought to introduce during
the hearing.

 TSBVI's third issue and the Dugoshes' cross-point are dispositive. 


Standard of review

 A plea to the jurisdiction challenges a trial court's authority to adjudicate a plaintiff's
cause of action. See Texas Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 225-26
(Tex. 2004). Analysis of whether this authority exists begins with the plaintiff's live pleadings. Id.
at 226. The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the
trial court's jurisdiction to hear the cause. Id. (citing Texas Ass'n of Bus. v. Texas Air Control Bd.,
852 S.W.2d 440, 446 (Tex. 1993)). Whether the plaintiff met this burden is a question of law that
we review de novo. Id. We construe the pleadings liberally and look to the pleader's intent. Id. If
the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction
but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading
sufficiency and the plaintiffs should be afforded the opportunity to amend. Id. at 226-27. If, on
the other hand, the pleadings affirmatively negate the existence of jurisdiction, then a plea to the
jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. Id. at 227. 

 When deciding a plea to the jurisdiction, we may consider evidence that the parties
have submitted and must do so when necessary to resolve the jurisdictional issues. Bland Indep. Sch.
Dist. v. Blue, 34 S.W.3d 547, 555 (Tex. 2000). In fact, in a plea to the jurisdiction, a party may
present evidence to negate the existence of a jurisdictional fact alleged in the pleadings. Miranda,
133 S.W.3d at 227. To the extent the challenge implicates the merits of the plaintiff's cause of
action, as here, the party asserting the plea has the burden of negating a genuine issue of material fact
as to the jurisdictional fact's existence, the same burden a movant must meet to prevail on a
traditional summary-judgment motion. See id. at 227-28. Whether the party meets this burden is
a question of law that we review de novo. Id. at 228. In making this determination, we take as true
all evidence favorable to the pleader and indulge every reasonable inference and resolve any doubts
in the pleader's favor. Id. (4) 


Sovereign immunity: general concepts

 Although the historical origins of the doctrine are found in concepts of royalty that
are foreign to American constitutional systems, sovereign immunity is nonetheless deeply rooted in
the Texas common law, although its underlying rationales have evolved considerably, and it still
stands as a barrier against suits and liability for money damages from the State, its agencies
and institutions, or state personnel in their official capacities. See City of Round Rock v. Whiteaker,
241 S.W.3d 609, 626 (Tex. App.--Austin 2007, pet. denied) (citing City of Galveston v. State,
217 S.W.3d 466, 468 (Tex. 2007); Reata Constr. Corp. v. City of Dallas, 197 S.W.3d 371, 374-75
(Tex. 2006); Tooke v. City of Mexia, 197 S.W.3d 325, 331-32 (Tex. 2006); Hosner v. De Young,
1 Tex. 764, 769 (1846)). The primary contemporary justification for sovereign immunity is that
individual citizens should bear the risk and cost of what are delicately termed the government's
"improvident acts" because it is considered beneficial to insulate the government (and the taxpayers
who fund it) from the civil liability private-sector persons would face for the same acts. Whiteaker,
241 S.W.3d at 626 (citing Reata Constr. Corp., 197 S.W.3d at 375; Tooke, 197 S.W.3d at 331-32). 

 Where it applies, and unless it is waived, sovereign immunity from suit deprives
a trial court of subject-matter jurisdiction. Id. Consequently, because they seek to recover money
damages from TSBVI (which, they do not dispute, is a state institution), the Dugoshes' suit
implicates sovereign immunity, which, unless waived, deprives the probate court of subject-matter
jurisdiction over their suit. See id.

 While sovereign immunity is a common-law doctrine that is ultimately within
the Texas Supreme Court's province to modify or even abrogate, see Texas Dep't of Crim. Justice
v. Miller, 51 S.W.3d 583, 592-93 (Tex. 2001) (Hecht, J., concurring), the high court has nonetheless
deferred to the legislature to decide when, if, or how to waive such immunity where it applies, in the
view that this body is better suited to weigh the public-policy considerations that bear upon those
judgments. See Whiteaker, 241 S.W.3d at 626-27 ("[T]he judiciary has deferred to the legislature
to decide when, if, or to what extent to waive immunity, as these decisions entail sensitive policy
judgments concerning the use of public resources and governmental functions that are the proper
domain of the legislative rather than judicial branch."); see also City of Galveston, 271 S.W.3d
at 469 (emphasizing that waiver of immunity "depends entirely upon statute") (quoting Dallas
County Mental Health and Mental Retardation v. Bossley, 968 S.W.2d 339, 341 (Tex. 1998)).
Relatedly, it is said that there exists a "heavy presumption in favor of immunity," City of Galveston,
271 S.W.3d at 469, and that "special rules of construction apply" to statutes that are asserted to
be waivers of immunity--"no statute should be construed to waive immunity absent 'clear and
unambiguous language.'" State v. Oakley, 227 S.W.3d 58, 62 (Tex. 2007) (quoting Tex. Gov't Code
Ann. § 311.034 (West 2005 & Supp. 2009).


The Dugoshes' claims

 To establish the probate court's subject-matter jurisdiction, the Dugoshes have
relied on one of the legislative waivers of sovereign immunity found in the tort claims act,
section 101.021(2) of the civil practice and remedies code. That provision partially waives a
"governmental unit's" (5) immunity from suit and liability for "personal injury and death so caused by
a condition or use of tangible personal or real property if the governmental unit would, were it a
private person, be liable to the claimant according to Texas law." Tex. Civ. Prac. & Rem. Code Ann.
§ 101.021(2) (waiving liability); see id. § 101.025 (waiving immunity from suit "to the extent of
liability created by this chapter"). (6) To establish a waiver of TSBVI's sovereign immunity under
section 101.021(2), the Dugoshes had the initial burden of alleging facts affirmatively demonstrating
that (1) a negligent or other culpable "condition or use" of (2) "tangible personal or real property"
(3) proximately caused Christopher's death; and (4) TSBVI would be liable to them under Texas law
for these acts or omissions if it were a private person. See Dallas County Mental Health & Mental
Retardation v. Bossley, 968 S.W.2d 339, 343 (Tex. 1998); Lowe v. Texas Tech Univ., 540 S.W.2d
297, 299 (Tex. 1976). To meet this burden, the Dugoshes attempted to assert two theories they
contend constitute the requisite "condition or use" of tangible personal property necessary to waive
immunity under section 101.021(2)--(1) the TSBVI personnel who prepared, served, or "fed"
Christopher his last meal negligently or with gross negligence gave him pieces of food much larger
than he could safely consume, given his limitations and conditions, proximately causing his choking
death; and (2) the TSBVI personnel negligently or with gross negligence administered a fatal
overdose of medication to Christopher.


 Food piece sizes

 Pleading allegations 

 Regarding their first waiver theory, the Dugoshes pled the following facts:


 At the time of his death, Christopher Dugosh was a student at [TSBVI].
Christopher was blind, deaf and profoundly impaired due to birth defects. His IQ
was between 20 and 25. His arms and legs were deformed and he was far below the
weight and height for his age. 


The Dugoshes attached a waist-up photograph of Christopher to their petition. It shows
physical features including the form and configuration of Christopher's arms. Each of Christopher's
arms is bent sharply upward from the elbow area, in a manner somewhat resembling a wing
on a baby bird. Each arm ends in a single thumblike digit that is bent sharply downward from
the wrist area.

 The Dugoshes continued:


 Mr. and Mrs. Dugosh informed TSBVI, through its employees, that
Christopher should be given small food portions because his birth defects made
it difficult for him to digest food and he was at risk for choking. Mr. and/or
Mrs. Dugosh demonstrated to TSBVI's employees the size of the food Christopher
should be given and told them that he should be given a toddler's diet. Mr. and
Mrs. Dugosh also provided a book to TSBVI that contained information on
Christopher's condition. That book also stated that Christopher was to be fed
a toddler's diet. TSBVI's employees were also provided a diagram or drawing of
the size of Christopher's food. TSBVI's employees caring for Christopher knew or
should have known that Christopher's food was to be cut up in small pieces, i.e.,
pieces smaller than the hot dogs and broccoli served and fed to Christopher by
Cogburn and Smith on May 19, 2005.


 Chris Cogburn and Carl Smith were responsible for Christopher's care on
the night that he day [sic] that he died, May 19, 2005. Cogburn and Smith were
employees of TSBVI and were acting in the course and scope of their employment
with TSBVI on the date of Christopher's death. On May 19, 2005, TSBVI
employees including Chris Cogburn and Carl Smith selected, bought, prepared,
cooked and cut Christopher Dugosh's food for his dinner meal and fed that food
to Christopher to eat. Christopher had deformed arms and could not eat without
assistance from Cogburn and Smith. Cogburn and Smith cut pieces of broccoli and
hot dog and fed such food to Christopher Dugosh to eat. The size of the broccoli was
1 ½ inches long and the size of the hot dog was 1 inch all around. Approximately
four pieces of broccoli and hot dog were given to Christopher by Cogburn and Smith.
Christopher was given french fries which were not cut into small pieces.


 Christopher choked on the broccoli, hot dogs and other food prepared, served
and provided to him by Cogburn and Smith. The 1 ½ " pieces of broccoli and 1 inch
all around pieces of hot dog were far larger than the portions that would be consistent
with a toddler diet, were larger than the size of the pieces of food demonstrated to the
staff of TSBVI by Mr. and/or Mrs. Dugosh and were larger than the size of the food
on the diagram or drawing available to Cogburn and Smith on the date of
Christopher's death. Cogburn and Smith's negligence in providing 1 ½" pieces of
broccoli and 1 inch all around pieces of hot dog to Christopher was a proximate
cause of Christopher's choking, asphyxiation, and death.



 There is no dispute that the Dugoshes sufficiently alleged that the acts or omissions
of which they complain were committed by TSBVI personnel acting within the scope of their
employment and for which the institution, were it a private employer, would be legally responsible.
Nor is there any dispute that the food portions these employees prepared, served and/or "fed" to
Christopher were the "tangible personal property" of TSBVI under section 101.021(2). (7) However,
TSBVI has challenged whether the facts the Dugoshes allege constitute a "condition or use" of the
food portions and whether they have demonstrated a sufficient causal nexus between any such
negligent or wrongful "use" or "condition" and Christopher's death by choking. Before turning to
these legal questions, we must first take into account the jurisdictional evidence that the
parties presented to the probate court. See Miranda, 133 S.W.3d at 227; Bland Indep. Sch. Dist.,
34 S.W.3d at 555.








 Jurisdictional evidence

 How Christopher was "fed"

 Although TSBVI did not dispute that its personnel had cooked, prepared, cut into
pieces, and served the food on which Christopher later choked, TSBVI presented evidence in an
attempt to negate any allegation that its personnel had placed food either directly in Christopher's
mouth or onto his eating utensil. TSBVI's evidence included documents reflecting the status
of Christopher's life skills at various junctures during his time at TSBVI; an excerpt from the
deposition of Kerim Pierce, one of the TSBVI employees involved with Christopher's care; the
medical examiner's autopsy report; (8) and an affidavit from Monte Chambers, R.N., the director of
TSBVI's Health Center. Chambers's affidavit attached medical-history forms from Christopher's
personal physician describing Christopher's conditions and impairments--and including the warning
that Christopher was at risk of "choking" and required a "toddler" diet with "no milk, beef,
small portions." The Dugoshes, in turn, presented, in addition to the aforementioned photograph of
Christopher, (9) live testimony from Christopher's father, appellee Richard Dugosh, and Carl Smith
and Chris Cogburn, the TSBVI personnel implicated by the Dugoshes' pleading allegations. TSBVI
also elicited important testimony from Smith and Cogburn on cross-examination. Both sides were
also permitted to read some deposition excerpts into the record.

 Smith and Cogburn acknowledged that, as the Dugoshes had alleged, they were
the TSBVI personnel who had been responsible for preparing and serving Christopher his last
meal and that this meal had consisted of broccoli, a hot dog, and french fries. Smith, who had been
Christopher's "primary residence instructor," admitted that he had prepared the hot dog and broken
it into four pieces for Christopher to consume. He further stated that either he or Cogburn had
similarly broken the french fries into pieces. Cogburn, in turn, admitted that he had prepared the
broccoli and cut it into pieces, although he could not remember the number of pieces. Smith further
admitted that because of Christopher's limitations, Christopher was dependent on them to prepare,
cut, and serve his food, as he "had no way of cutting his own food himself and feeding it to himself." 
Smith and Cogburn likewise acknowledged that they had remained in close proximity to Christopher
while he was eating.

 TSBVI presented evidence that by the time of Christopher's last meal, he had
become proficient in using an adapted spoon to scoop up food and move it to his mouth. The
Dugoshes introduced a photograph of the spoon into evidence. The photograph shows a spoonlike
device with a strap that was used to attach it to Christopher's arm. In his deposition, Kerim Pierce
recounted that Christopher's spoon had "sort of revolutionized his eating because it allowed him to
be independent in scooping his food and eating it, whereas previously . . . he had been fed mostly." 
TSBVI also introduced two documents on its letterhead titled, "Residential Annual Report of Present
Competencies." Each document contains a summary of Christopher's "strengths" and "needs" with
respect to "domestic" and "recreational/leisure" "basic skills" and identifies various "priority areas"
or goals for Christopher's further development in these areas. The first of these documents, dated
February 26, 2004, identifies among Christopher's "domestic" skills strengths, "Chris has learned
to eat very effectively with an adapted spoon, and can use an adapted cup to drink." The second,
dated January 10, 2005, states, "Chris has learned to eat very neatly with an adapted spoon, and does
so with no assistance except to affix the spoon to his arm." Each documents contains both Richard
and Mel Dugosh's signatures, along with those of various other TSBVI educators and counselors,
verifying that each had been present at a meeting to discuss the "proceedings and recommendations,"
understood what had been discussed, and agreed with the proceedings and recommendations.

 Cogburn squarely denied that he ever assisted Christopher in getting food into
his mouth. TSBVI's counsel was also permitted to read into the record an excerpt from Smith's
deposition in which Smith similarly denied that anyone helped Christopher feed himself during his
last meal. (10) However, Cogburn's testimony was inconsistent and somewhat equivocal as to whether
he ever assisted Christopher in getting food onto his spoon. Initially, when asked by the Dugoshes'
counsel whether he helped Christopher with getting the hot dog or broccoli into his mouth, Cogburn
admitted that "I help him with the spoon" by "putting the spoon on the plate and helping him get the
food on it." In response to further questioning, Cogburn observed that food would sometimes fall
off Christopher's spoon while he was trying to eat it. He was then asked by the Dugoshes' counsel
whether he would help Christopher get the food back on the spoon in that situation. Cogburn
responded, "I don't recall if I--if that was something I would do." Later, the Dugoshes' counsel
returned to that question, and Cogburn persisted in denying recollection of what he would do when
food fell off of Christopher's spoon. Then, during cross-examination by TSBVI's counsel, Cogburn
divulged that if "the hot dog falls off onto the table," he would "put it back on the plate," but again
claimed that he did not recall what he would do when food fell off Christopher's spoon. However,
with continued questioning by TSBVI's counsel, Cogburn began repeatedly denying that he placed
food either in Christopher's mouth or on his spoon. At that juncture, Cogburn also insisted that the
lack of recollection he had previously acknowledged concerned whether, when returning dropped
food to Christopher's plate, he might have placed the food onto Christopher's spoon if the spoon was
positioned there. (11)

 As for Richard Dugosh, he testified that during the eighteen years when he and Mel
were Christopher's primary caregivers, Christopher had required continual monitoring and assistance
when eating, even when using an adaptive spoon, and "wouldn't be able to feed himself." Richard
elaborated that because of the difficulties Christopher encountered in using his arms, food would
roll or fall off his spoon. Consequently, Richard recounted, a caregiver would need to remain with
Christopher while he ate and put food back on the spoon when it fell off. However, while Richard
indicted that it would sometimes be necessary to administer medication to Christopher by spooning
it into his mouth, as he "would spit it out" otherwise, Richard did not testify that caregivers would
place food directly into his mouth.

 Richard further asserted, without citing specific factual support, that the extent
to which Christopher required assistance when eating remained unchanged after Christopher
moved to TSBVI. During cross-examination, however, Richard conceded that he had no personal
knowledge of how Christopher ate his meal on the evening he died. Richard also acknowledged
signing the two previously discussed TSBVI "Residential Annual Reports of Present Competencies."

 In addition, the Dugoshes' counsel was permitted to read into the record an excerpt
from the deposition of Mary Lou Rink, the TSBVI's dietician at the time of Christopher's death, to
the effect that Christopher's conditions necessitated that someone remain with him while he ate (12) and
an excerpt from Cogburn's deposition in which he stated that, after he and Smith prepared the food,
"We fed Chris."

 On this record, we conclude that TSBVI has met its burden of conclusively negating
any allegation that Smith or Cogburn placed food directly into Christopher's mouth with an eating
utensil or otherwise. See Miranda, 133 S.W.3d at 227-28. TSBVI presented evidence that neither
Smith nor Cogburn "fed" Christopher in this manner, and the Dugoshes presented no evidence
that they did. The conclusion that Smith or Cogburn "fed" Christopher in some manner, without
more, is insufficient to raise a fact issue as to whether they did so by placing food in his mouth. See
id.; Ryland Group, Inc. v. Hood, 924 S.W.2d 120, 122 (Tex. 1996) (per curiam). However, we
conclude--especially in light of Cogburn's testimony--that TSBVI has not met its burden to
conclusively negate the allegation that Cogburn "fed" Christopher by placing food on his adapted
spoon and helping him put food back on the spoon when it fell off. Consequently, we presume the
truth of that allegation--along with the Dugoshes' unchallenged allegations that Smith and Cogburn
prepared Christopher's meal and cut the broccoli and hot dog into the sized pieces described in the
medical examiner's report--when analyzing whether the Dugoshes have asserted the required
"condition or use" of tangible personal property under section 101.021(B). See id.


 Causal nexus between the food and Christopher's death 

 TSBVI presented evidence in an attempt to establish that several minutes
passed between the time that Christopher finished eating and when he first began choking. The
medical examiner's report reflects a contemporaneous account from Smith that Christopher ate
dinner at approximately 4:50 p.m., was playing in his room at approximately 5:05 p.m., and then,
at approximately 5:26 p.m., ran down the hallway gasping for air and collapsed in front of Smith.
Cogburn similarly testified that the choking event occurred 15-20 minutes after Christopher had
finished eating. According to Cogburn, "When Chris finished eating he went into his room and I
cleaned his plate and the--the table and I went into the common area and was talking and watching
TV with the kids and Kerim and Mike Beninger [another TSBVI staffer]. And then Chris came out
and then went--he came into the common area and then went back into his room and then came
back out again a couple minutes later and that's when he looked--he looked like he was having
trouble and that's when Kerim and Mike went and assisted him." Cogburn indicated that there was
no question Christopher had finished his meal and swallowed all of his food before going to his
room. The Dugoshes did not present evidence to controvert that at least fifteen to twenty minutes
elapsed between the time Christopher finished his meal and when he began showing signs of
choking and that Christopher had even been playing in his room for approximately 15-20 minutes
in the meantime. 

 On the other hand, Cogburn acknowledged that Christopher had regurgitated some
of his food before he choked and had regurgitated "just a dribble" while still eating. As previously
noted, the medical examiner later found "poorly chewed" portions of food material--"including a
portion of the end of a hot dog measuring 1 inch all around . . . pieces of broccoli measuring up to
1-1/2 inches in dimension as well as similar pieces of dumplings"--"packed" in both Christopher's
upper airway and his esophagus. It was "asphyxia due to choking on bolus of food," with his
Cornelia de Lange syndrome a "contributing condition," that the medical examiner concluded caused
Christopher's death.


 Cutting-up of the food 

 Finally, because it becomes significant to our analysis below, we note that TSBVI
presented uncontroverted evidence that either Smith or Cogburn broke the french fries into pieces
before serving them to Christopher. While the Dugoshes had pled that "Cogburn and Smith cut
pieces of broccoli and hot dog" (which the jurisdictional evidence confirmed), they also had alleged
that "Christopher was given french fries which were not cut into small pieces." The latter allegation
is negated by the uncontroverted evidence that Smith or Cogburn did, in fact, break the french fries
into pieces before serving them to Christopher. See Miranda, 133 S.W.3d at 227-28. 




 Analysis 

 We now consider whether the facts pled by the Dugoshes and not conclusively
negated by TSBVI invoked the probate court's jurisdiction by establishing a "condition or use" of
tangible personal property attributable to TSBVI that proximately caused Christopher's death. See
Miranda, 133 S.W.3d at 226-28. 


 "Use" of the food?

 The legislature has never defined the term "use" under section 101.021(2),
and Texas courts have been vexed for decades by the term's vagueness and arbitrary operation. See,
e.g., University of Tex. Med. Branch at Galveston v. York, 871 S.W.2d 175, 178 (Tex. 1994)
(summarizing the supreme court's "long and arduous history" of struggling to construe
section 101.021(2) and of requesting the legislature to clarify the provision); see also Miller,
51 S.W.3d at 589-93 (Hecht, J., concurring) (concluding that "it is simply impossible for the courts
to meaningfully construe and consistently apply the use-of-property standard in the Tort Claims Act"
and attributing the problem principally to the absence of any discernable guiding legislative policy
regarding when or why sovereign immunity should be waived in a particular case). Despite these
challenges, the supreme court over the decades has enunciated principles that give us some
guidance here.

 Lacking a legislative definition of "use," the supreme court has applied the ordinary
meaning of the term--"to put or bring into action or service; to employ for or apply to a given
purpose." San Antonio State Hosp. v. Cowan, 128 S.W.3d 244, 246 & n.10 (Tex. 2004). (13) The court
has further reasoned from the context of the legislature's use of "use" in section 101.021(2) that the
governmental unit whose conduct is challenged must itself be the "user" of the property to waive
immunity. Id. at 246.

 As a general rule, a governmental unit's act of furnishing tangible personal property
to a person for him to use is not considered a "use" of the property by the unit that can waive
immunity under section 101.021(2). Two stark illustrations of this rule's recent application by
the Texas Supreme Court are provided in Dallas County v. Posey, 290 S.W.3d 869, 870 (Tex. 2009)
(per curiam), and Cowan, 128 S.W.3d at 245-47. Both Posey and Cowan involved suits against
governmental units arising from suicides by patients or inmates in unit-owned facilities. In both
cases, the individual used personal property furnished or provided by the governmental unit to kill
himself. Posey, 290 S.W.3d at 870 (inmate hung himself with ligature he devised from frayed
receiver cord of telephone in his cell); Cowan, 128 S.W.3d at 245-47 (mental hospital patient hung
himself with suspenders and walker that hospital had returned to him). In each case, the supreme
court held that the governmental unit did not, by furnishing or providing the property to the decedent,
"use" the property so as to come within section 101.021(2)'s waiver of immunity. See Posey,
290 S.W.3d at 870 (no "use" of telephone because "the county did no more than place Posey in a cell
with a corded telephone, which he used to commit suicide"); Cowan, 128 S.W.3d at 245-47 ("A
governmental unit does not 'use' personal property merely by allowing someone else to use it
and nothing more. . . . By providing Cowan his walker and suspenders, the Hospital did not 'use'
them within the meaning of section 101.021(2)."). This was so, significantly, even though the
plaintiffs in both Posey and Cowan had alleged and/or presented evidence that the decedent had
presented a suicide risk that the governmental unit was negligent in ignoring when furnishing the
decedent the property. Posey, 290 S.W.3d at 870-72; Cowan, 128 S.W.3d at 245.

 On the other hand, the supreme court has continued to recognize what it now terms
a narrow exception to the rule that a governmental unit's act of furnishing personal property to an
individual to use is not a "use" of that property by the government--immunity is waived under
section 101.021(2) for "claims in which a plaintiff alleges that a state actor has provided property
that lacks an integral safety component and that the lack of this integral safety component led to the
plaintiff's injuries." Cowan, 128 S.W.3d at 247 (quoting Kerrville State Hosp. v. Clark, 923 S.W.2d
582, 585 (Tex. 1996)). This exception derives from an earlier line of cases in which the
supreme court had held that governmental units' negligent provision of defective or deficient
protective equipment was a "condition or use" (it did not specify whether it was one, the other,
or both) of personal property that waived immunity under section 101.021(2). Robinson v. Central
Tex. MHMR Ctr., 780 S.W.2d 169, 169, 171 (Tex. 1989) (MHMR center's provision of swim attire
lacking life preserver to epileptic child prone to seizures constituted a "condition or use" that waived
immunity); Lowe, 540 S.W.3d at 298-300 (university's provision of protective gear to football player
that did not include special protection for his injured knee constituted a "condition or use" that
waived immunity); Overton Mem'l Hosp. v. McGuire, 518 S.W.2d 528, 528-29 (Tex. 1975)
(per curiam) (hospital's provision of bed for patient that was not equipped with side rails was a
"condition or use" of property that waived immunity). Although the literal language and reasoning
of these decisions were arguably broader, the supreme court has subsequently clarified that "the
precedential value of [Robinson, Lowe, and Overton] is . . . limited to claims in which a plaintiff
alleges that a state actor has provided property that lacks an integral safety component and that
the lack of this integral component led to the plaintiff's injuries." Clark, 923 S.W.2d at 585 (also
terming the cases "perhaps the outer bounds of what we have defined as use of tangible
personal property.").

 Underlying the supreme court's contemporary view of these decisions is its
reasoning that whatever "use" may mean under section 101.021(2), it cannot mean a failure to use
or "non-use" of personal property. See id. A related concern is that "use" of personal property under
section 101.021(2) cannot mean every form of negligence committed by a governmental unit that
happens to involve personal property in some way, as this would expand what the legislature plainly
intended as a limited waiver of immunity into effectively a general waiver. See id. at 585-86 ("There
cannot be a waiver of sovereign immunity in every case in which medical treatment is provided in
a public facility. . . . If such a complaint were enough to constitute the use of tangible personal
property under the Act, the doctrine of sovereign immunity would be rendered a nullity.") (citing
Lowe, 540 S.W.2d at 302 (Greenhill, C.J., concurring) ("It is difficult to imagine a tort case which
does not involve the use, or nonuse, of some item of real or personal property; and to me, if there is
a waiver in all cases where some item of personal property is either used or not used, there is
virtually an unrestricted waiver of immunity.")). Driven by these concerns, the supreme court has
sought to distinguish between a governmental unit's affirmative act of furnishing or providing
personal property that completely lacks an "integral safety component," which it continues to regard
as waiving immunity under Robinson, Lowe, and Overton, from a governmental unit's failure to
provide personal property, or provide better, safer, alternative personal property, which it regards as
a non-use of property that does not waive immunity. See Texas A&M Univ. v. Bishop, 156 S.W.3d
580, 583-84 (Tex. 2005) (allegation that university provided student actors knife without adequate
"stab pad" did not assert "use" of the knife by university or complete absence of integral safety
component, but a "non-use" by failing to provide a more effective safety feature); Clark, 923 S.W.2d
at 585 (mental hospital's prescribing oral medication alleged to be less effective than
alternative injectable treatment complained of a non-use of property, a failure to provide a more
effective treatment).

 TSBVI equates this case with Posey and Cowan, urging that it did no more than
provide food for Christopher's use, but itself made no "use" of the food. It further asserts that there
are no allegations the food was "defective" or lacking in any "integral safety component" and that,
to the extent the size of the food pieces could be considered a "safety component," the Dugoshes
complain not of a complete absence of that component but only of TSBVI's failure to provide a
better alternative--Smith and Cogburn cut or broke the food into pieces, but allegedly were negligent
in failing to provide smaller, safer pieces. Thus, TSBVI concludes, the Dugoshes' claims would
be governed by Bishop and Clark, and would constitute claims for non-use rather than use of
personal property. Bishop, 156 S.W.3d 583-84; Clark, 923 S.W.2d at 585.

 In response, the Dugoshes attempt to distinguish Posey and Cowan by suggesting 
that Cogburn and Smith had greater involvement with the food than did the governmental units in
those cases. They urge that "Cogburn and Smith selected, purchased, cooked, prepared and cut
the oversized hot dogs and broccoli." They further assert that because "Christopher's arms were
deformed," TSBVI "had to feed the broccoli and hot dogs to Christopher" and assist him in
consuming it. As we have previously explained, TSBVI negated any allegation that TSBVI
employees placed the food in Christopher's mouth, but still before us are the Dugoshes' allegations
that TSBVI cooked, prepared, cut and served the food and that Cogburn assisted Christopher in
getting the food onto his adapted spoon. These are allegations, the Dugoshes reason, that "the
oversized broccoli and hot dogs were 'put into service' and employed for a 'given purpose' by
employees of TSBVI." They additionally suggest that this case is governed by Overton, the "integral
safety component" case that involved a hospital patient being placed into a bed lacking safety rails. 
See Overton Mem'l Hosp., 518 S.W.2d at 528-29.

 Guided by the Texas Supreme Court's recent jurisprudence delineating the meaning
of "use" of tangible personal property under section 101.021(2), we must conclude that the Dugoshes
assert claims of TSBVI's ordinary negligence or non-use of personal property, not a "use" of
property for which section 101.021(2) waives immunity. While TSBVI cooked, cut, and prepared
the food and even helped Christopher get it onto his spoon, it remains that it was Christopher, not
TSBVI, that ultimately put the food to its intended use by eating it. See Bishop, 156 S.W.3d at 583-84 (although faculty advisers allowed use of real knife in student theatrical production, the advisors
"did not themselves 'put or bring [the knife] into action or service' or 'employ [the knife] for or
apply [it] to a given purpose,' as we have said the term 'use' intends.") (modification in original). 
Alternatively, even if it could be said that Smith and Cogburn "used" the food in some sense by
preparing, cutting or breaking it into pieces, and giving it to Christopher, such "uses" in themselves
would lack the requisite causal nexus to Christopher's choking and death. Everything turns,
under the Dugoshes' theory of liability and waiver, on the fact that Christopher ate the food. This
is a use of the food by Christopher, not a use by TSBVI. To this extent, this case is analogous to
Posey and Cowan.

 We recognize that under the Dugoshes' pleadings and the jurisdictional evidence, as
viewed through the prism of our standard of review, Christopher was highly if not totally dependent
upon Smith and Cogburn for the food that he ate and had mental, visual, and auditory impairments
that would have reduced his capacity to ascertain the risk of eating the food he was given. However,
we must ultimately conclude that Posey and Cowan are not distinguishable on that basis. In both
Posey and Cowan, the decedent was vulnerable to suicidal impulses, yet the supreme court held that
the government unit's act of furnishing him with the very property he used to kill himself was not
a "use" of that property and that it was instead the decedent himself who had "used" the property
to fatal ends. Posey, 290 S.W.3d at 870-72; Cowan, 128 S.W.3d at 245. Christopher was in an
identical position to the decedents in Posey and Cowan as far as the relevant "use" of tangible
personal property is concerned.

 To the extent the Dugoshes are attempting to complain of the absence of an "integral
safety component" in the food Christopher was given (i.e., the absence of pieces sufficiently
small for Christopher to consume safely), we agree with TSBVI that this complaint would be
governed by Bishop and Clark and would not fall within the Overton line of cases. Assuming the
size of the food pieces is a "safety component" for purposes of this rule, the Dugoshes complain
(once the jurisdictional evidence is considered) not of the complete absence of such a component
(i.e., that Smith and Cogburn failed to cut or break the broccoli, hot dogs, or french fries into pieces
at all), but of TSBVI's failure to use a safer or better alternative component (i.e., giving Christopher
smaller, safer pieces and/or using kitchen utensils to cut the pieces smaller). See Bishop, 156 S.W.3d
583-84; Clark, 923 S.W.2d at 585.

 The real substance of the Dugoshes' complaint is that TSBVI negligently failed to
instruct and supervise Smith and Cogburn in preparing Christopher's food and/or that Smith
and Cogburn negligently failed to carry out those instructions, not that TSBVI "used" the food in the
sense required to waive immunity under section 101.021(2). See Bishop, 156 S.W.3d 583. The mere
fact that these alleged acts of negligence involved or concerned the tangible personal property of
food is not enough to waive TSBVI's immunity under section 101.021(2), and to hold otherwise
"would be tantamount to abolishing [sovereign] immunity, contrary to the limited waiver the
Legislature clearly intended." Id. (quoting Clark, 923 S.W.2d at 585).

 In urging that TSBVI "used" the food in some respect relevant to waiver
under section 101.021(2), the Dugoshes also rely on a decision of the Texarkana Court of Appeals,
Texas State Technical College v. Beavers, 218 S.W.3d 258 (Tex. App.--Texarkana 2007, no pet.). 
In Beavers, a student in a diesel engine testing and repair course was injured while using a hydraulic
hoist as part of his course instruction. He sued the college for negligence and sought to establish
waiver of the college's sovereign immunity by alleging his injuries had been proximately caused
by the college's "use" of the hoist. While holding that the student's claims did not fall within
the complete absence of an "integral safety component" exception for personal property furnished
to an individual to use, id. at 263-65, the Texarkana court nonetheless concluded that the college had
"used" the hoist through the manner in which it had utilized the hoist as part of the student's
course instruction. See id. at 265-67. We do not believe these facts involving a college's use of
an instructional aid in a class are analogous to TSBVI's provision of food for Christopher to eat. 
Consequently, we are not persuaded that Beavers counsels a departure from our analysis
and conclusion that the Dugoshes have not asserted claims within the use-of-property waiver of
section 101.021(2).

 We hold that the Dugoshes have not asserted claims that Christopher's death was
proximately caused by TSBVI's negligent "use" of tangible personal property so as to come within
section 101.021(2)'s waiver of sovereign immunity.


 "Condition" of the food?

 Even if they have not asserted a claim of negligent "use" of tangible
personal property, the Dugoshes urge, they have nonetheless complained of a "condition" of property
for which immunity is waived under section 101.021(2)--the food pieces that Christopher was
served or "fed" were too large for him to consume safely. As with "use," the legislature did not
define what a "condition" of property means under section 101.021(B), so Texas courts have looked
to the ordinary meaning of the term--"either an intentional or an inadvertent state of being." 
Sparkman v. Maxwell, 519 S.W.2d 852, 858 (Tex. 1975). With respect to negligence clams
concerning real property, it is established that section 101.021(2) incorporates premises-liability
concepts and limitations. See City of Austin v. Leggett, 257 S.W.3d 456, 462-63 (Tex. App.--Austin
2008, pet. denied). Regarding "conditions" of personal property for which section 101.021(2)
waives immunity, the Texas Supreme Court has stated that "condition" implies that the property is
"defective or inadequate," Salcedo v. El Paso Hosp. Dist., 659 S.W.2d 30, 32 (Tex. 1983), and that
such defect or inadequacy "pose[s] a hazard in the intended and ordinary use of the property." 
Posey, 290 S.W.3d at 872. With this, the supreme court has emphasized the requirement of a causal
nexus between the "condition" and the injury made the basis for suit. See id.; Bossley, 968 S.W.2d
at 343. This nexus requires "more than the mere involvement of property; rather, the condition must
actually have caused the injury." Posey, 290 S.W.3d at 872.

 As it did with "use" of tangible personal property section 101.021(2), Posey provides
a recent illustration of the supreme court's view regarding "conditions" of tangible personal property
that can waive immunity under section 101.021(2). The decedent in Posey was placed in a county-
jail holding cell containing a land-line telephone whose handheld receiver was connected to the
phone by a cord. The cord had exposed wires. The decedent killed himself by fashioning a ligature
by running the telephone receiver through the exposed wires. See id. at 870-72. In addition to
alleging that the county had "used" the phone by giving it to the decedent, the deceased's parents
asserted that the exposed wires were a "condition" of the phone that had proximately caused
the deceased's death. See id. In rejecting that theory as a matter of law, the supreme court
acknowledged that the exposed wires might have been a "condition"--"a hazard in the intended and
ordinary use of the property"--inasmuch as they "posed an electrical hazard to an ordinary user of
the telephone." Id. at 872. Nonetheless, the court reasoned, the required causal nexus between that
condition and the death was lacking--"the exposed wires here did not cause the injury; they instead
constituted no more than a condition of the property that was then used by Posey to form a ligature
for suicide." Id.

 As TSBVI points out, the Dugoshes do not allege that there was anything hazardous
or defective about the broccoli, hot dog, and french fries with respect to their ordinary and intended
use as food generally. Instead, their complaint is that TSBVI personnel failed to furnish Christopher
smaller, safer pieces of this food (or to cut or break the food into smaller pieces). The Dugoshes rely
on the ordinary meaning of "condition" (a particular mode or state of being). By alleging that "[t]he
portions of hot dogs and broccoli fed to Christopher by Cogburn and Smith were too large" and that
this caused Christopher to choke, the Dugoshes reason, they "have alleged a 'condition' of tangible
personal property that was a proximate cause of Christopher's death." 

 We have concluded above that the Dugoshes' claims concern non-use of tangible
personal property or other negligent acts of TSBVI that are beyond the scope of section 101.021(2)'s
waiver. See Bishop, 156 S.W.3d 583-84; Clark, 923 S.W.2d at 585. As we understand the
Texas Supreme Court's jurisprudence, we do not think that the Dugoshes can establish a waiver
under section 101.021(2) merely by characterizing their claims of non-use of personal property
(failure to use a safer alternative of smaller food pieces or to use kitchen utensils to cut the food into
smaller pieces) or other general negligence as a complaint about the "condition" of the food portion
sizes TSBVI did provide. To so hold would imply that every non-use case involving allegations of
a governmental unit's negligence in failing to provide a safer alternative could establish waiver if
only the plaintiff would couch his complaint in terms of the "condition" of the less-safe property the
unit did provide. We do not believe the principles governing waiver of sovereign immunity under
section 101.021(2) work this way.

 In cases where a plaintiff seeks to establish waiver of immunity under
section 101.021(2) based on a governmental unit's furnishing of tangible personal property for
another person to use, the Texas Supreme Court has appeared to require the complete absence of an
"integral safety component" to waive immunity under either the "use" and "condition" prongs of
the statute. The cases giving rise to the "integral safety component" exception do not distinguish
between "condition or use." See Robinson, 780 S.W.2d at 169-71; Lowe, 540 S.W.3d at 298-300;
Overton Mem'l Hosp., 518 S.W.2d at 528-29. Likewise, in its more recent cases, the supreme court
has characterized the "integral safety component" requirement as part of the "condition" prong,
or both the "condition" and "use" prongs. See Cowan, 128 S.W.3d at 245 ("Respondents do not
complain of the condition of Cowan's walker and suspenders. They do not assert, for example, that
the walker and suspenders were defective or that they lacked some safety feature."), 247 ("As already
noted, respondents make no such claim [of an absent 'integral safety component'] in this case.");
Texas Dep't of Crim. Justice v. Miller, 51 S.W.3d 583, 587 (Tex. 2001) ("The Tort Claims act
and our cases have distinguished claims involving the failure to use, or the non-use of property,
which do not waive sovereign immunity, from claims involving a 'condition or use' of tangible
personal property that causes injury, which do effect a waiver.") (emphasis added). Several of our
sister courts, at least in recent years, have agreed with our assessment. See Beavers, 218 S.W.3d
at 264 n.1 ("Whether the requirement is analyzed under the 'condition' or 'use' section of
[section 101.021(2)], the Texas Supreme Court has made it clear that, unless the governmental
agency has 'used' tangible personal property in some other manner so as to waive immunity,
merely supplying the property for another's use, without more, does not waive immunity unless
the supplied property is completely lacking an integral safety component."); see also University of
N. Tex. v. Harvey, 124 S.W.3d 216, 222-24 (Tex. App.--Fort Worth 2003, pet. denied) (applying
the "integral safety component" requirement in determining whether immunity was waived under
the "condition" prong of section 101.021(2)).

 Guided by these decisions, we conclude that regardless whether the Dugoshes purport
to rely on the "use" or "condition" prong of section 101.021, sovereign immunity is not waived for
their complaint because it concerns tangible personal property furnished to Christopher for his use,
not property that TSBVI used, and does not assert the complete absence of an "integral safety
component" in that property, but only non-use of property or other acts of negligence by TSBVI for
which section 101.021(2) does not waive immunity.

 In contending otherwise, the Dugoshes rely on a decision from the San Antonio Court
of Appeals that has some factual similarities to the present case. See Webb County v. Sandoval,
88 S.W.3d 290, 292-95 (Tex. App.--San Antonio 2002, no pet.) (Sandoval I). Sandoval I arose
after a four-year-old child choked to death on chicken nuggets that had been served to her by a
county-run Head Start program. Her parents sued the county seeking damages. The San Antonio
Court of Appeals held that the parents sufficiently alleged the requisite "condition" under
section 101.021(2) by pleading that the chicken nuggets were "overcooked, too hard and too large,"
and that this proximately caused the child to choke to death. Id. at 292-95.

 As TSBVI points out, no Texas court to date has followed Sandoval for the
proposition that alleging food is cooked to be "too hard" or "too large" and furnished to another
person to use or consume, causing them to choke, alone states a claim for a "condition" of tangible
personal property that waives sovereign immunity under section 101.021(2). And, assuming without
deciding that Sandoval I correctly reflects Texas law, there are factual distinctions between it and the
present case. Unlike here, there is no indication in Sandoval I that there were allegations or evidence
Head Start staff had cut the chicken nuggets into smaller pieces. See id. at 292-95; see also Webb
County v. Sandoval, 126 S.W.3d 264, 265-67 (Tex. App.--San Antonio 2003, no pet.) (Sandoval
II) (in opinion following further proceedings after Sandoval I, citing jurisdictional evidence that
nuggets had been prepared and served "in a manner consistent with the packaging instructions"). 
Thus, as far as the size of the nuggets is concerned, Sandoval I would arguably fall within the
complete-absence-of-an-"integral safety component" line of cases. We also note that the asserted
"condition" of the chicken nuggets in Sandoval I was one that would tend to create a choking hazard
for persons generally and, unlike here, was not solely a function of the particular decedent's inability
to consume them safely. Although the decedent was a four-year-old child--an age at which a person
is not always prone to chew her food thoroughly and swallow it safely--the San Antonio court did
not appear to view the child's age or related limitations as relevant to its analysis of the asserted
"condition" and its causal nexus to the child's death. (14) Here, as we have noted, the Dugoshes do not
allege that the food Christopher was served was hazardous to persons generally, only that TSBVI
was negligent in failing to give him smaller, safer pieces of the food. In sum, we are not persuaded
that Sandoval changes our analysis. 

 We hold that the Dugoshes have not asserted claims that Christopher's death was
proximately caused by a "condition" of tangible personal property TSBVI furnished him, so as to
waive immunity under section 101.021(2).


 Drug overdose 

 Pleading allegations

 In addition to their allegations regarding the size of food pieces Christopher was
furnished on the evening he died, the Dugoshes pled that Christopher's death was also caused by an
overdose (i.e., a misuse) of medication administered by TSBVI staff:

[A] medication (Wellbutrin) was provided to Christopher by TSBVI on the date of
Christopher's death. Cogburn, Smith and/or other employees of TSBVI negligently
withheld Christopher's prescribed medication for the purpose of giving Christopher
more than the prescribed dose of such medication at times when Christopher's
behavior was difficult to control or presented problems for TSBVI's employees. 
Christopher had a toxic level of Wellbutrin in his blood stream on the date of his
death. The negligence and/or gross negligence of Cogburn, Smith and/or non-medical employees of TSBVI in withholding prescribed medications and then
providing Christopher a toxic dosage of Wellbutrin on the date of his death was a
proximate cause of Christopher's death.



 Jurisdictional evidence

 TSBVI presented evidence in an attempt to negate the Dugoshes' allegation that
Christopher was administered a "toxic dose" of Wellbutrin. This included the copy of the
medical examiner's autopsy report that TSBVI introduced at the hearing, which contained a
handwritten notation indicating that this medication was "not at toxic level." Additionally, in the
affidavit from Nurse Chambers, she testified that Christopher was "never administered more than
his prescribed doses of Wellbutrin, nor was he ever administered toxic levels of Wellbutrin." The
Dugoshes did not introduce any evidence to controvert TSBVI's evidence that Christopher had
not been administered a toxic dose of Wellbutrin. To the contrary, as TSBVI emphasizes,
Richard Dugosh acknowledged during cross-examination that he was unaware that his attorney
had added this allegation to the Dugoshes' claims and that he could not identify any evidence to
support that allegation.

 We conclude that TSBVI met its burden of negating, as a matter of law, the
Dugoshes' allegation that its personnel proximately caused Christopher's death by administering
a fatal overdose of Wellbutrin. See Miranda, 133 S.W.3d at 227-28. Consequently, sovereign
immunity is not waived as to this allegation.


The Dugoshes' cross-point 

 In their cross-point, the Dugoshes argue that the probate court abused its discretion
in excluding excerpts from two depositions they sought to introduce during the evidentiary hearing. 
The first set of excerpts was from the deposition of Mary Lou Rink, TSBVI's dietician at the time of
Christopher's death. The second was from the deposition of Robert Bayardo, former Travis County
Medical Examiner, who performed the autopsy on Christopher and prepared the report that TSBVI
introduced into evidence.

 The hearing took place over the course of two days. The reporter's record from the
hearing reflects that immediately after Cogburn's testimony concluded, which was on the second day
of the hearing, the parties took up the matter of deposition excerpts with the probate court. The
record reflects that the Dugoshes' counsel furnished deposition excerpts to TSBVI's counsel and
represented to the court that "I gave them all to her last night" (i.e., following the first day of the
hearing). Following a break, TSBVI's counsel confirmed with the court that the Dugoshes' deadline
for filing their response to TSBVI's plea to the jurisdiction had been nine days earlier. Counsel then
objected to the Dugoshes' excepts as "hearsay," "not properly authenticated," "irrelevant," and "not
timely," adding that "by receiving these at the earliest last night they serve as a surprise and we have
no opportunity to counter them." Counsel further objected to Bayardo's deposition testimony on the
ground that Bayardo had not been properly designated as an expert. TSBVI's counsel also tendered
a list of page and line objections to the excerpts. In response, the Dugoshes' counsel offered to prove
up the authenticity of the excerpts but disputed that he had any duty to designate deposition page
and line numbers prior to the evidentiary hearing. The probate court sustained TSBVI's objection
to the excerpts' admission. Subsequently, in response to an inquiry from the Dugoshes' counsel,
the court indicated that, in fact, counsel had been required to designate the deposition excerpts prior
to the hearing.

 On appeal, the Dugoshes complain that "the Court allowed TSBVI to introduce
deposition excerpts" and "stated that it would permit Appellees to introduce deposition excerpts."
They add that "[t]he deposition excerpts were relevant and properly authenticated," "[n]o scheduling
order required the designation of deposition excerpts before the hearing," and that "Dr. Bayardo was
designated as an expert." This is the entirety of the Dugoshes' arguments in support of their cross-point. TSBVI responds that the Dugoshes waived their cross-point by failing to adequately brief it.
See Tex. R. App. P. 38.1(h). On this record, we need only hold that the Dugoshes have not met their
burden of demonstrating that the district court abused its discretion in excluding their deposition
excerpts. We overrule the Dugoshes's cross-point. 


CONCLUSION

 As the Texas Supreme Court has observed, whether immunity is waived by
section 101.021(2) turns on "problematic" distinctions between "use" and "non-use" of tangible
personal property, Miller, 51 S.W.3d at 588-89, that lack grounding in any coherent policies
as to why immunity should be waived in a particular case as opposed to another. See id. at 591
(Hecht, J., concurring). Yet it remains that "the Legislature drew that line in the Tort Claims Act,"
Miller, 51 S.W.3d at 589, and it is our duty to apply it, like we are bound to apply the doctrine of
sovereign immunity, unless and until the Texas Supreme Court or the Legislature instructs us
otherwise. See Petco Animal Supplies, Inc. v. Schuster, 144 S.W.3d 554, 564 (Tex. App.--Austin
2004, no pet.).

 Based on the foregoing analysis, we sustain TSBVI's third issue and hold that
the Dugoshes have not asserted a claim for which sovereign immunity is waived under
section 101.021(2). Consequently, they have not invoked the probate court's subject-matter
jurisdiction, so we must reverse the probate court's order denying TSBVI's plea to the jurisdiction. 
Furthermore, because the Dugoshes' factual allegations have either been negated as a matter of law
or affirmatively demonstrate that their claims are based on TSBVI's non-use of tangible personal
property or other negligence for which sovereign immunity has not been waived, (15) we must render
judgment dismissing the Dugoshes' claims with prejudice. See Texas A&M Univ. Sys. v. Koseoglu,
233 S.W.3d 835, 840 (Tex. 2007); Miranda, 133 S.W.3d at 227. Because these holdings are
dispositive of this appeal, we do not reach TSBVI's other issues. See Tex. R. App. P. 47.1.


 _________________________________________ Bob Pemberton, Justice

Before Chief Justice Law, Justices Puryear and Pemberton;

 Chief Justice Law not participating

Reversed and Rendered

Filed: March 26, 2010
1. TSBVI's notice of appeal identified appellees as "Mel Dugosh and Richard Dugosh,
Individually and as next friend of C. D." We have corrected the caption to reflect that Mel Dugosh
is appearing in her capacity as independent executor of Christopher's estate rather than as
next friend.
2. At age 20, Christopher was four feet, five inches in height and weighed 66.5 pounds.
3. See Tex. Civ. Prac. & Rem. Code Ann. §§ 71.001-004 (wrongful-death statute), .021
(survival statute) (West 2008).
4. A somewhat different standard applies when a challenge to a jurisdictional fact's existence
does not implicate the merits of the pleader's cause of action. University of Tex. v. Poindexter, ___
S.W.3d ___, No. 03-04-00806CV, 2009 WL 1896071, at *3 (Tex. App.--Austin July 3, 2009,
no pet.). 
5. The Dugoshes do not dispute that TSBVI is a governmental unit. See Tex. Civ. Prac.
& Rem. Code Ann. § 101.001(3)(A), (D) (West 2005) (defining "governmental unit" under tort
claims act). 
6. See also id. §§ 101.023(a) (West 2005) (limits on State's liability exposure), .024
(West 2005) (no waiver for exemplary damages).
7. See University of Tex. Med. Branch at Galveston v. York, 871 S.W.2d 175, 178 (Tex. 1994)
("Although 'tangible' is not defined in the Tort Claims Act, there can be little doubt that tangible
personal property refers to something that has a corporeal, concrete, and palpable existence.").
8. The report was included in medical records that had been subpoenaed from
Christopher's psychiatrist. As discussed below, the copy of the report in evidence included some
handwritten notes.
9. The Dugoshes also introduced a photograph of the adapted spoon Christopher used
at TSBVI, discussed below. 
10. Smith testified:

Q: [by the Dugoshes' counsel] Did Chris feed himself that night with his

 spoon or did someone help him?


A: He fed himself.
11. The following exchange between Cogburn and TSBVI's counsel is illustrative:


Q: Did you ever lift food from Christopher's plate and put it into his mouth?


A: No. What I do is I--I make sure the pieces are cut and accessible for the
kids.


Q: Okay. So you prepared the food?


A: I prepare the food.


Q: And you put it in the plate?


A: And I put it in the plate.


Q: But you don't--


A: And the if he--the hot dog falls off on to the table I put it back on to the
plate. 


Q: On the plate, okay?


A: Yeah.


Q: But not on to the spoon?


A: I don't recall--I don't--that's--that's a--


Q: Is that what you're saying you don't recall about?


A: That's what I'm saying I don't recall. And I don't--I don't do that. I don't
--I don't put the food on the spoon and I don't lift it to the kids' mouth.


Q: Okay.


A: My--my not recalling is the--putting it on to the plate when there is a spoon
on the plate. That's a gray area, putting on the plate.


Q: You recall maybe--and I--and I'm not trying to feed you words, I'm trying
to figure out what it is that you don't recall. And the Court--the Court needs
to know this too.


A: Yeah. I don't recall--I don't put the food on the spoon and I don't feed the
kids.


Q: Okay.


A: What I don't recall is--I mean, I put the food on the plate and--. . . 


A: I think I'm making this more complicated because I don't put the food on the
spoon. What made me say I don't recall is that the--the spoon is on the
plate, I put the food on the plate, it gets on the spoon. It's not--


Q: I understand.


A: If that makes sense.


Q: I understand. So if you -- if a piece of food had gotten out of the plate and
you--like on the table and you put it back on the plate--


A: Uh-huh.


Q: --if the spoon might have been in the--in the plate or on the plate you might
have actually put it on the spoon in that circumstance. It's not that you would
have deliberately put it on the spoon. Is that what you were saying?


A: Yeah. That's what I don't recall too, it's not--I don't--I'm not--


Q: You don't recall that with specificity?


A: I don't recall the specificity and the gradation of the spoon--the spoon is like
this and the hot dog rolls on the spoon. It's just that I don't recall. That's--I
don't put the food on the spoon and I don't assist a kid with delivering the
food to his or her mouth. I don't--

12. Rink testified:


Q: Somebody would be there with him [Christopher]?


A: Uh-huh.


Q: Why would they be there with him?


A: Well, a toddler diet, somebody would need to be feeding, you know, be
sitting there with him while he ate.


Q: Why would somebody need to be there with him while he ate?


A: Because he couldn't eat by himself.
13. Accord City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26 (Tex. 2008) (when
construing statutes, we rely on the plain meaning of the text, unless a different meaning is
supplied by legislative definition or is apparent from context, or unless such a construction leads to
absurd results).
14. This is especially apparent in the court's opinion following further proceedings. Following
Sandoval I, the county, resuming its efforts in the trial court, presented jurisdictional evidence in an
attempt to negate the causal nexus between the "condition" of the chicken nuggets and the child's
death. Webb County v. Sandoval, 126 S.W.3d 264, 266-67 (Tex. App.--San Antonio 2003, no pet.)
(Sandoval II). This included affidavit testimony from Head Start personnel to the effect that nothing
about the chicken nuggets had been unusual or would have reasonably tended to cause a person
to choke. The county also presented affidavit testimony from a paramedic who had treated the child
at the scene, who recounted that he observed the food that was removed from the child's trachea and
saw a "piece of chicken approximately two inches in length that seemed to be partially chewed." 
Id. at 267. Based on his observations, the paramedic opined that "it was obvious that the patient
had not chewed the piece of chicken sufficiently in order to swallow it properly." Id. Based on this
uncontroverted evidence, the San Antonio court concluded that while "[t]he chicken nugget blocked
[the child's] trachea, . . . it was the failure to sufficiently chew the chicken nugget that caused her
injuries." Id. Consequently, the court reasoned, "the evidence, at best, suggests Webb County did
no more than furnish [the child] with the condition or object (the chicken nugget) which made her
injuries possible" and, therefore, negated the casual nexus required to waive sovereign immunity
under section 101.021(2). Id.


 Again, the San Antonio court reached this conclusion despite the fact that the decedent was
a four-year-old child. And arguably the same causation analysis would apply here--especially
where there was undisputed evidence that Christopher had actually swallowed his food fifteen to
twenty minutes before he began choking.
15. I.e., under the Dugoshes' pleadings and uncontroverted jurisdictional evidence, Cogburn
and Smith cut or broke the broccoli, hot dog, and french fries before serving them to Christopher,
and thus did not furnish food entirely lacking this "integral safety component."