**KERRVILLE STATE HOSPITAL,**
**Petitioner,**

v.

**James O. CLARK and Genevie**
**Clark, Respondents.**

**No. 95–0773.**

Supreme Court of Texas.

Argued Dec. 12, 1995.

Decided May 10, 1996.

Rehearing Overruled July 8, 1996.

David Allan Smith, Austin, for Petitioner.

Sydney S. Ewing, Boerne, Randall B. Richards, Boerne, for Respondents.

GONZALEZ, Justice, delivered the opinion of the Court in which HECHT, ENOCH, OWEN and BAKER, Justices, join.

This is a wrongful death action brought by James and Genevie Clark to recover damages for the death of their daughter, Rebecca Clark Ligon, who was murdered by her husband, Gary Ligon. The Clarks sued Kerrville State Hospital (KSH) for negligently releasing Gary, a mental patient, from its care. They also sued the Texas Department of Mental Health and Mental Retardation (MHMR) for failure to adequately ensure KSH's compliance with MHMR standards.

A jury awarded the Clarks damages in excess of two million dollars. The trial court, however, entered judgment n.o.v. for MHMR and rendered judgment against KSH for $250,000, the maximum amount allowable under the Texas Tort Claims Act. *See* TEX.CIV. PRAC. & REM.CODE § 101.023(a). The court of appeals affirmed. 900 S.W.2d 425. For the reasons stated below, we reverse the judgment of the court of appeals and render judgment for KSH.

I.

The Clarks' daughter, Rebecca, was married to Gary Ligon, who had a history of mental problems. In April 1989, after threatening his wife and resisting arrest, Ligon was taken to KSH for treatment. The Institutional Review Board determined that Ligon was "manifestly dangerous" and therefore recommended that he be transferred to a maximum security unit at Vernon State Hospital. However, because Vernon State Hospital had no vacancy, Ligon remained at KSH for about one month. The Institutional Review Board then met again and determined that Ligon was no longer manifestly dangerous. Ligon began an outpatient commitment with KSH, pursuant to a court order, so that KSH could monitor his medication. Ligon's medication regimen included Antabuse to control his alcohol intake, lithium carbonate, Tegretol, and Thorazine, an antipsychotic medicine that was given to Ligon in an oral form.

On May 22, 1990, Ligon voluntarily checked into KSH for treatment. It appeared that Ligon had been drinking and had not been taking his medication at proper levels. On May 24, KSH released Ligon at his request, reinstating the outpatient commitment. On June 1, Ligon brutally murdered his estranged wife, decapitating, dismembering, and burning her body. He then attempted to hide her remains in a field.[1]

As stated earlier, the trial court rendered judgment for the Clarks against KSH, and the court of appeals affirmed. KSH now petitions this Court to reverse the judgment

---

1. Ligon was charged with murder, but was declared incompetent to stand trial and was transferred to the maximum security unit at Vernon State Hospital.

of the court of appeals, claiming that: (1) the Clarks' suit is barred by sovereign immunity; (2) KSH owed no duty to the Clarks; (3) the actions of KSH were not the proximate cause of Rebecca Clark's death; and (4) venue was not proper in Travis County. Because we conclude that the Clarks' action was barred by sovereign immunity, we reverse the judgment of the court of appeals and render judgment for KSH.[2]

## II.

KSH is a governmental entity entitled to sovereign immunity. However, under the Texas Tort Claims Act, a state entity can waive its sovereign immunity under limited circumstances. The Act did not abolish sovereign immunity, and we must look to the terms of the Act to determine the scope of its waiver. *University of Texas Medical Branch v. York*, 871 S.W.2d 175, 177 (Tex. 1994). Specifically, the Act waives sovereign immunity for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX.CIV.PRAC. & REM.CODE § 101.021(2). The Clarks claim that KSH, by giving Ligon an oral form of Thorazine when he left the hospital, rather than an available injectionable drug such as Prolixin or Haldol, used or misused tangible personal property under the terms of the Act. They claim that KSH should have administered an injectionable drug because KSH knew that Ligon had not been taking his oral Thorazine and that he became violent when not medicated.[3] Thus, the issue is whether KSH's administration of an oral form of Thorazine, rather than an injectionable drug, constitutes use or misuse of tangible personal property under the terms of the Texas Tort Claims Act. We hold that KSH's failure to administer an injectionable drug is non-use of tangible personal property and therefore does not fall under the waiver provisions of the Act.

This Court has never held that mere non-use of property can support a claim under the Texas Tort Claims Act. *Kassen v. Hatley*, 887 S.W.2d 4, 14 (Tex.1994). We have recognized that for "use" of tangible personal property to occur under the terms of the Act, one must " 'put or bring [the property] into action or service; to employ for or apply to a given purpose.' " *Mount Pleasant Indep. Sch. Dist. v. Estate of Lindburg*, 766 S.W.2d 208, 211 (Tex.1989) (quoting *Beggs v. Texas Dept. of Mental Health & Mental Retardation*, 496 S.W.2d 252, 254 (Tex.Civ.App.—San Antonio 1973, writ ref'd)). The decisions of this Court, however, have not always fallen neatly within this definition when applying the terms of the Act. The difficulty of interpreting the Act's waiver provisions has led this Court on several occasions to request guidance from the Legislature in interpreting these provisions. *See, e.g., Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 32 (Tex. 1983); *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 303 (Tex.1976) (Greenhill, C.J., concurring). The Legislature, however, has remained silent on this issue. As a result, our attempts to construe the Act's waiver provisions have resulted in a "long and arduous history" of cases. *University of Texas Medical Branch v. York*, 871 S.W.2d 175, 177 (Tex.1994). Two of these cases, in particular, illustrate the difficulty of interpreting these provisions.

In *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 298 (Tex.1976), Lowe alleged that he injured his knee while playing football for the university. The injury allegedly occurred when a coach ordered him to remove his knee brace, worn because of a previous knee injury, and reenter a game without it. *Id.* at 302 (Greenhill, C.J., concurring). This Court concluded that the knee brace was as integral a part of Lowe's uniform as his helmet or shoulder pads. *Id.* at 300. The Court therefore held that the State waived immunity by providing Lowe with a football uniform that was defective due to its lack of a knee brace. *Id.*

This rationale was also applied to invoke the Act's waiver provisions in *Robinson v.*

---

2. Because we hold that the Clarks' claims are barred by sovereign immunity, we need not consider KSH's other alleged grounds for reversal.

3. The Clarks presented expert testimony that injectionable Prolixin and Haldol can be effective for up to one month after the initial injection.

*Central Texas MHMR Center,* 780 S.W.2d 169, 171 (Tex.1989). In *Robinson,* MHMR took several patients, including Robinson, swimming. *Id.* at 169. The employees of MHMR knew that Robinson was epileptic and occasionally suffered seizures, causing him to lose consciousness. *Id.* MHMR and its employees, however, failed to provide Robinson with a life preserver, and he subsequently drowned. *Id.* This Court concluded that "[a] life preserver was just as much a part of Robinson's swimming attire as the knee brace was part of the uniform in *Lowe.*" *Id.* at 171. The Court therefore held that MHMR waived its immunity. *Id.*

These cases represent perhaps the outer bounds of what we have defined as use of tangible personal property. We did not intend, in deciding these cases, to allow both use and non-use of property to result in waiver of immunity under the Act. Such a result would be tantamount to abolishing governmental immunity, contrary to the limited waiver the Legislature clearly intended. The precedential value of these cases is therefore limited to claims in which a plaintiff alleges that a state actor has provided property that lacks an integral safety component and that the lack of this integral component led to the plaintiff's injuries. For example, if a hospital provided a patient with a bed lacking bed rails and the lack of this protective equipment led to the patient's injury, the Act's waiver provisions would be implicated. *Lowe,* 540 S.W.2d at 300.

The facts of the present case, however, are distinguishable from *Lowe* and *Robinson.* The Clarks have not alleged that KSH failed to provide Ligon with property lacking an integral safety component. In fact, they acknowledge that KSH prescribed to and gave Ligon Thorazine, an anti-psychotic medication. To the contrary, the Clarks argue that the treatment prescribed to Ligon was not as effective as an alternative method of treatment would have been. For *Lowe* to apply to the Clarks' claims, we must assume that the university would have waived its immunity even if it had provided Lowe with a knee brace as long as Lowe could show that another type of knee brace would have better protected him. Likewise, for *Robinson* to

apply, we must assume that MHMR would have waived its sovereign immunity even if it had provided Robinson a life preserver if Robinson could show that MHMR should have provided him with a better one. Thus, the facts of this case are different than those in *Lowe* and *Robinson.*

### III.

The factual scenario of this case parallels *Kassen v. Hatley,* 887 S.W.2d 4 (Tex.1994). In *Kassen,* a mental patient admitted to a state hospital was seen taking her medication in excessive quantities. *Id.* at 7. Hospital employees therefore took the patient's medication away from her. *Id.* The hospital refused to return the medication to the patient when she left the hospital, and she committed suicide a short time later. *Id.* The patient's parents sued the hospital and its employees for wrongful death, claiming that the hospital employees' failure to provide the patient with medication when she left the hospital caused her death. *Id.* We concluded that "[t]his sequence of events does not allege an injury arising from the 'use' of the medication. It states a claim for non-use of property that does not trigger waiver of sovereign immunity under the Texas Tort Claims Act." *Id.* at 14. Here, KSH's employees gave Ligon an oral form of Thorazine when he left the hospital, just as they had done since the beginning of Ligon's outpatient commitment order. The Clarks allege that KSH should have administered an injectionable drug to ensure Ligon's compliance, rather than the oral form given. They claim that if an injectionable medication had been used, Ligon would not have murdered his wife. The Clark's pleadings and evidence do not show that oral Thorazine caused any harm. The gravamen of their complaint is that KSH's non-use of an injectionable drug was the cause of their daughter's death. This failure to use a form of drug is just as much a non-use of a drug as was the hospital's failure to give its patient her medicine in *Kassen.*

■ There cannot be waiver of sovereign immunity in every case in which medical treatment is provided by a public facility. Doctors in state medical facilities use some

form of tangible personal property nearly every time they treat a patient. Because of this fact, a patient suing for negligence could always complain that a different form of treatment than the one employed would have been more effective and still claim waiver under the Act. If such a complaint were enough to constitute the use of tangible personal property under the Act, the doctrine of sovereign immunity would be rendered a nullity. "It is difficult to imagine a tort case which does not involve the use, or nonuse, of some item of real or personal property; and to me, if there is a waiver in all cases where some item of personal property is either used or not used, there is virtually an unrestricted waiver of immunity." *Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 302 (Tex.1976) (Greenhill, C.J., concurring). Abolition of immunity is not what the Legislature intended in enacting the Texas Tort Claims Act.

Because the failure to prescribe a certain form of drug simply does not fall within the definition of use under the Act, KSH did not waive its sovereign immunity. For the foregoing reasons, we reverse the judgment of the court of appeals and render judgment for KSH.

ABBOTT, J., filed a dissenting opinion in which PHILLIPS, C.J., and CORNYN and SPECTOR, JJ., join.

ABBOTT, Justice, joined by PHILLIPS, Chief Justice, CORNYN and SPECTOR, Justices, dissenting.

I dissent because the Court incorrectly interprets the facts and abandons precedent. The Court erroneously classifies this as a "non-use" case under the Texas Tort Claims Act and concludes that sovereign immunity is not waived. In reality, this case involves a "misuse" of drugs. Evidence showed that Kerrville State Hospital (KSH) prescribed drugs which were inappropriate for the purpose intended. Under this Court's precedent, use of an inappropriate drug constitutes misuse of tangible personal property and waives sovereign immunity.

The treatment plan KSH created for Gary Ligon required him to meet with a KSH staff member at least once a month "for delivery of medications." KSH was aware that Ligon was not taking his medications and that he became violent when not medication-compliant. Nonetheless, KSH prescribed the oral medication, Thorazine, and released Ligon. Dr. Schultheis, a physician who treated Ligon at KSH, and Dr. Coons, an expert for KSH, testified that Haldol and Prolixin are injectable antipsychotic medications which could be used instead of Thorazine and could be effective for up to one month. Dr. Rosenthal, an expert for the Clarks, testified that the long lasting injections of Prolixin or Haldol should have been used instead of the oral form of Thorazine. Dr. Rosenthal further testified that the use of a long lasting, injectable antipsychotic medication, rather than the inappropriate oral medication, would have kept Ligon medication-compliant and safe for release, preventing the tragic murder of Rebecca Ligon. This evidence, indicating misuse of Thorazine, waived sovereign immunity. Similarly, the condition of the medication—oral rather than injectable—causes a waiver of sovereign immunity.

I.

The Texas Tort Claims Act (Act) waives sovereign immunity for "personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law." TEX.CIV.PRAC. & REM.CODE § 101.021(2). The "use" of tangible personal property occurs when the property is brought into action or is employed for a given purpose. *Mount Pleasant Indep. Sch. Dist. v. Lindburg*, 766 S.W.2d 208, 211 (Tex. 1989).

Clearly, prescription drugs are tangible personal property. *See Kassen v. Hatley*, 887 S.W.2d 4, 15 (Tex.1994) (Phillips, C.J., dissenting). Sovereign immunity was waived when KSH used drugs to treat Ligon's psychotic behavior. *See Quinn v. Memorial Medical Ctr.*, 764 S.W.2d 915, 917 (Tex. App.—Corpus Christi 1989, no writ); *see also Kassen*, 887 S.W.2d at 15 (Phillips, C.J., dissenting). In *Quinn*, the court held that the dispensing of a drug is the use of tangible personal property and waives immunity un-

der the Act. 764 S.W.2d at 917. In this case, the delivery of medications by a KSH staff member likewise constitutes use of medications, waiving immunity under the Act. The Court's reliance on the majority in *Kassen* is misplaced since, in that case, the hospital took medicine away from a patient rather than misusing medicine it was prescribing to a patient.

"Liability has been imposed when the injuries are alleged to have proximately resulted from the negligent use of property in some respect deficient or inappropriate for the purpose for which it was used." *Hopkins v. Spring Indep. Sch. Dist.*, 706 S.W.2d 325, 327 (Tex.App.—Houston [14th Dist.] 1986), *aff'd*, 736 S.W.2d 617 (Tex.1987); *see also LeLeaux v. Hamshire-Fannett Indep. Sch. Dist.*, 835 S.W.2d 49, 51 (Tex.1992) (stating that use means to bring into action or to apply for a given purpose). In this case, there is evidence that the use of Thorazine by KSH was both deficient and inappropriate for the purpose of safely releasing Ligon, triggering a waiver of immunity. *See Lowe v. Texas Tech Univ.*, 540 S.W.2d 297, 300 (Tex.1976) (deficient football uniform); *Overton Memorial Hosp. v. McGuire*, 518 S.W.2d 528, 529 (Tex. 1975) (deficient hospital bed); *Texas Dep't of Corrections v. Jackson*, 661 S.W.2d 154, 158 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.); *see also Robinson v. Central Tex. MHMR Ctr.*, 780 S.W.2d 169, 174 (Tex. 1989) (Hecht, J., dissenting) (agreeing that "a governmental unit may be liable for furnishing defective property."). The jury was presented evidence that the drug KSH furnished to Ligon was defective because KSH knew Ligon was not taking his medication.

Admittedly, non-use or failure to use an available drug is not, standing alone, a use of tangible personal property sufficient to waive immunity under the Act. *Kassen*, 887 S.W.2d at 14. This case, however, does not involve the mere failure to provide necessary medicine. Rather, it involves the prescription of a drug which KSH knew Ligon had not taken in the past and probably would not take in the future. Non-use of an available drug is not the proper focus when there is also misuse of prescription medication.

In *Lowe*, this Court held that the failure to include a knee brace when providing a football uniform was a condition or use of tangible personal property. *Lowe*, 540 S.W.2d at 300. Similarly, this Court held that the failure to furnish an available life preserver, as part of a swimming uniform, to an MHMR patient waived sovereign immunity when the staff knew the patient suffered from epileptic seizures which caused him to pass out. *Robinson*, 780 S.W.2d at 171. The circumstances supporting a waiver of immunity here are even stronger than in *Lowe* and *Robinson*, as KSH furnished drugs specifically to treat Ligon's psychotic behavior. It would be as if the State furnished an inappropriate knee brace in *Lowe*, or an inappropriate life preserver in *Robinson*. Even the dissenting justices in *Robinson* recognized this would constitute misuse of tangible personal property. 780 S.W.2d at 175 (Hecht, J., dissenting) ("[H]ad the state mental health center ... negligently supplied Robinson's grandson with a defective life preserver, resulting in his death, its liability would be beyond question."). Precedent thus mandates a decision denying sovereign immunity to KSH.

The Court struggles to distinguish *Lowe* and *Robinson* and says that the "difficulty of interpreting the Act's waiver provisions has led this Court on several occasions to request guidance from the Legislature in interpreting these provisions." *Ante* at 584. The Court ignores, however, its previous and consistent proclamation that legislative inaction following judicial interpretation evidences legislative adoption of such interpretation. *See Robinson*, 780 S.W.2d at 170 n. 4; *Allen Sales and Servicenter, Inc. v. Ryan*, 525 S.W.2d 863, 866 (Tex.1975); *Marmon v. Mustang Aviation, Inc.*, 430 S.W.2d 182, 186 (Tex.1968); *Moss v. Gibbs*, 370 S.W.2d 452, 458–59 (Tex.1963). The Legislature's refusal to revise the waiver provisions of the Act following *Lowe* and *Robinson* implies that it has adopted those decisions.

## II.

KSH also claims that it had no duty to Rebecca. Relying on *Bird v. W.C.W.*, 868 S.W.2d 767 (Tex.1994), KSH argues that a

mental health professional owes a duty of care only to his or her patient. Alternatively, KSH insists that a duty to a non-patient arises only if there are specific threats against specific persons. *Williams v. Sun Valley Hosp.*, 723 S.W.2d 783 (Tex.App.—El Paso 1987, writ ref'd n.r.e.).

The Clarks concede that health care professionals owe no blanket duty to the public. But, they disagree with the assertion that a specific threat against a specific person is required to establish a duty to a non-patient. Instead, the Clarks argue that KSH had a duty because KSH had control over Ligon and knew or reasonably should have known that he posed a serious danger to a readily identifiable person or class of persons. I agree.

At the outset, I conclude that *Bird* does not control this case. In *Bird*, we held that a mental health professional who negligently misdiagnoses sexual abuse of a child owes no duty of care to the child's parent who may suffer false accusations and adverse legal consequences from the misdiagnosis. In reaching that decision, we relied on factors unique to that factual setting, such as the inherent difficulty in diagnosing sexual abuse of a child and the social utility in encouraging a full investigation of sexual abuse claims. *Bird*, 868 S.W.2d at 769. Because those factors have no bearing on a mental health professional's duty of care to third persons who may be harmed by a violent, psychotic patient, *Bird* is not controlling.

More analogous to this case is *Otis Engineering Corp. v. Clark*, 668 S.W.2d 307 (Tex. 1983). In that case we held that employers who exercise control over incapacitated employees owe a duty of reasonable care to third parties who risk injury from that employee. *Otis Eng'g*, 668 S.W.2d at 311. "Such a duty may be analogized to cases in which a defendant can exercise some measure of reasonable control over a dangerous person when there is a recognizable great danger of harm to third persons." *Id.; see also Graff v. Beard*, 858 S.W.2d 918, 920 (Tex.1993) (stating that the right to control is a factor in determining duty).

In recognizing this duty, we have relied in part on section 319 of the *Restatement (Second) of Torts* which provides:

§ 319. Duty of Those in Charge of Person Having Dangerous Propensities

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

RESTATEMENT (SECOND) OF TORTS § 319 (1965); *see Otis Eng'g*, 668 S.W.2d at 311.

Section 319 establishes a duty of care in this case. Following Ligon's release from KSH in August 1989, he remained under a court-ordered out-patient commitment. In the out-patient commitment order, the court rendered findings that Ligon is "mentally ill," that as a result of that mental illness he is "likely ... [t]o cause serious harm to self and/or others," and that, if not treated, he will "continue to suffer severe and abnormal mental, emotional or physical distress...." The court designated Lois Hutson, a clinical social worker with KSH, as the individual responsible for Ligon's out-patient care, directing her to submit a treatment program to be incorporated into the commitment order. *See* TEX.HEALTH & SAFETY CODE § 574.037. This treatment program recognized that Ligon had a long history of "assaultive and aggressive behaviors" and was "potentially very dangerous." It called for treatment through a drug regimen to control Ligon's physical aggression and to alleviate his psychotic symptomatology, and it required Ligon to return to the hospital for periodic examinations to monitor his compliance. Hutson was required by statute to inform the court if Ligon failed to comply with the treatment program. *See* TEX.HEALTH & SAFETY CODE § 574.037(c)(1). Under these circumstances, KSH was in "charge" of Ligon for purposes of section 319 of the *Restatement.*

Further, there is evidence that KSH knew or should have known that Ligon posed a likely threat to Rebecca if he was not properly medicated. In addition to the findings in the commitment order and treatment program, Ligon's medical records indicated that he was the "most dangerous [type of] patient

seen in a psychiatric practice." "He is potentially suicidal and/or homicidal." "Patient is violent when intoxicated, has attempted suicide several times, has been assaultive towards family and police." "Patient is potentially suicidal and/or homicidal and is alcohol dependent and non-compliant in taking anti-manic meds." "This patient can become extremely dangerous to self or others if not medication-compliant and abstinent from alcohol." Under these circumstances, KSH clearly owed a duty to Rebecca to exercise reasonable care in treating Ligon for his psychotic behavior.

### III.

KSH next argues that there is no evidence that any action on its part caused Rebecca's death. When deciding a no evidence point we must consider only the evidence and all reasonable inferences which support the jury finding. *See Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992). If there is more than a scintilla of evidence to support the finding, the no evidence challenge must fail. *Id.*

Proximate cause has two elements, foreseeability and cause-in-fact. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992). Foreseeability is satisfied if a person of ordinary intelligence should have anticipated the danger caused by his negligent act. *Id.* The particular manner of the injury need not be foreseeable to establish this element. *Id.* "Although the criminal conduct of a third party may be a superseding cause which relieves the negligent actor from liability, the actor's negligence is not superseded and will not be excused when the criminal conduct is a foreseeable result of such negligence." *Id.*

As discussed earlier, there are notes in Ligon's medical file discussing his homicidal tendencies, his assaultive behavior towards his family, his failure to remain medication-compliant, and his violent behavior when not medication-compliant. Further, Ligon was originally committed to KSH for assaulting his wife. This is some evidence that KSH knew or should have known that Ligon would assault Rebecca if released without being properly medicated. As such, the foreseeability prong is satisfied.

Cause-in-fact may be proven by circumstantial evidence. *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 459 (Tex.1992). Cause-in-fact is established if the negligent act "was a substantial factor in bringing about the injury, and without it harm would not have occurred." *Travis,* 830 S.W.2d at 98; *see also Brown v. Edwards Transfer Co.,* 764 S.W.2d 220, 223 (Tex.1988).

Experts for both the Clarks and KSH testified that Ligon's medical records indicated that he had been violent towards Rebecca when not medication-compliant and that if released without being properly medicated he would likely be violent towards Rebecca again, especially considering his ongoing separation and divorce. Ligon admitted to the KSH doctors that he was not taking his medication. Dr. Rosenthal, an expert for the Clarks, testified that KSH could have assured Ligon's compliance with his treatment plan by administering long-acting forms of antipsychotic medication by injection, and that the absence of such injections was a "real deficiency" in his treatment plan. This, coupled with the evidence of Ligon's history of violent behavior when off antipsychotic medication, and Ligon's violent murder of Rebecca only seven days after being discharged, is some evidence from which the jury could infer that the hospital's misuse of medication caused Rebecca's death.

### IV.

While I conclude that there is some evidence that KSH misused tangible personal property within the meaning of the Tort Claims Act, KSH correctly contends that the trial court erred in submitting the liability issue to the jury. Question 1, which the jury answered affirmatively, provided as follows:

Was Kerrville State Hospital negligent in discharging Gary Ligon on May 24, 1990?

You are instructed that in determining the negligence, if any, of the officers and employees of Kerrville State Hospital, consider only their use or misuse of *medical records, admission and discharge documents,* and/or medications of Gary Ligon.

(emphasis added). KSH objected to this question, arguing to the trial court that "the

particular properties that are attempted to be listed [in question 1] do not come within the definition of *tangible personal property,* with the exception of medications." The court overruled this objection.

KSH argues that the jury should not have been permitted to consider the use or misuse of medical records or other documents, over its timely objection. I agree. While the paper on which medical records and other documents are printed constitutes tangible personal property, the information contained in the records and documents is intangible. *See University of Texas Med. Branch v. York,* 871 S.W.2d 175, 179 (Tex.1994). The Tort Claims Act does not waive immunity for misuse of intangible information, even if the information is reduced to writing. *Id.* Because question 1 .erroneously allowed the jury to consider the hospital's misuse of the information contained in Ligon's medical records, KSH is entitled to a new trial. *See Spencer v. Eagle Star Ins. Co.,* 876 S.W.2d 154, 157 (Tex.1994).

For the foregoing reasons, I would reverse the judgment of the court of appeals and remand this cause to the trial court for a new trial.