# IN THE SUPREME COURT OF TEXAS

═══════════

No. 17-0730

═══════════

THE UNIVERSITY OF TEXAS M.D. ANDERSON CANCER CENTER, PETITIONER,

v.

LANCE MCKENZIE, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF
COURTNEY MCKENZIE-THUE (DECEASED), AND DEBORAH DIVER, INDIVIDUALLY
AND AS NEXT FRIEND OF J.O., A MINOR, RESPONDENTS

═══════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
═══════════════════════════════════

CHIEF JUSTICE HECHT, joined by JUSTICE GREEN and JUSTICE BROWN, dissenting.

Suffering from rare, Stage IV appendiceal cancer, Courtney McKenzie-Thue elected to undergo a complex, clinical-trial procedure detailed in a protocol developed by the Wake Forest University School of Medicine. The procedure began with extensive surgery to remove tumors growing throughout her peritoneal cavity, followed by a perfusion of the cavity with a chemotherapy drug mixed with D5W—sugar water—to kill remaining cancer cells. The ten-hour procedure was performed flawlessly at the University of Texas M.D. Anderson Cancer Center, but two days later, unexpectedly and tragically, McKenzie-Thue died of unlikely complications from the use of the sugar water prescribed by the protocol, a risk M.D. Anderson had recognized—though it never before had resulted in death—and took steps to prevent.

The Court holds that M.D. Anderson's immunity from this wrongful-death suit is waived by the Texas Tort Claims Act ("the Act")[1] because plaintiffs, the McKenzies,[2] claim that death was proximately caused by the negligent use of the sugar water—not in the *manner* of use, which was perfect, but in the use of the sugar water *at all*. But the use of the sugar water was prescribed by the surgical protocol and was an integral part of the procedure. If sugar water could not be used, the procedure could not have been performed, and whether to perform the procedure was a medical judgment for which, the Court acknowledges, immunity is not waived. The involvement of sugar water cannot change that. If sugar water should not have been used, neither should a scalpel have been, or the surgical apparatus, or for that matter, the building. Surgery cannot be performed without the use of real and personal property, and if that use and a bad result are sufficient to waive immunity, the Act's waiver is very broad. Today's decision runs counter to the Court's decisions that the Act's waiver of immunity is limited.

The Court also holds that McKenzie-Thue's death was foreseeable, a requirement of proximate causation, because hyponatremia was a known risk of the use of sugar water. But death from the procedure had never previously occurred and was unlikely; M.D. Anderson took all proper

---

[1] TEX. CIV. PRAC. & REM. CODE §§ 101.001–.109. M.D. Anderson is a *governmental unit* with immunity under the Act. *See* TEX. CIV. PRAC. & REM. CODE § 101.001(3)(D) (defining governmental unit to include "any . . . institution . . . the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution"); *see also* TEX. CONST. art. VII, § 10 ("The Legislature shall as soon as practicable establish, organize and provide for the maintenance, support and direction of a University of the first class . . . styled, 'The University of Texas' . . . ."); TEX. EDUC. CODE § 65.02(a) ("The University of Texas System is composed of the following institutions and entities: . . . (11) The University of Texas M.D. Anderson Cancer Center . . . ."); *LTTS Charter Sch., Inc. v. C2 Constr., Inc.*, 342 S.W.3d 73, 86 (Tex. 2011) (stating that "public universities . . . satisfy the precise standards articulated by section 101.001(3)(D)").

[2] Plaintiffs are McKenzie-Thue's father, Lance McKenzie, individually and on behalf of McKenzie-Thue's estate, and her mother, Deborah Diver, individually and on behalf of McKenzie-Thue's minor son.

precautions to prevent it; and the McKenzies' only medical expert, Dr. David H. Miller, testified squarely that McKenzie-Thue's death, though "a possibility," was neither "predictable" nor "foreseeable." The Court's conclusion directly contradicts settled law that injury is foreseeable only if it is the "natural *and probable*" consequence of an action.[3] There are risks to any surgery. Healthcare providers should know what they are and try to prevent them. That is exactly what M.D. Anderson did here. The effect of the Court's decision is to impose strict liability for any bad result from surgery.

Today's decision departs from the Act and our caselaw and strikes all healthcare providers, government and private alike, a heavy blow. I respectfully dissent.

## I

Courtney McKenzie-Thue, 33, suffered from advanced Stage IV cancer of the appendix, a rare disease that manifests in tumors growing on the organs and tissues in and around the peritoneal cavity. Dr. Paul Mansfield, a surgical oncologist at M.D. Anderson, recommended that McKenzie-Thue undergo an experimental intraperitoneal hyperthermic chemotherapy procedure—IPHC[4]—developed by the Wake Forest University School of Medicine. The protocol calls for the surgeon to open the peritoneal cavity, resect all tumors and visible signs of cancer, and close the incision. A perfusionist then pumps several liters of a chemotherapy drug mixed with a heated carrier solution into the cavity through a circuit of tubes and filters, bathing the organs and tissues. The patient's

---

[3] *See, e.g.*, *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 477 (Tex. 1995) (emphasis added) (quoting *Carey v. Pure Distrib. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939)).

[4] The procedure is also sometimes referred to with the acronyms HIPEC and HYPEC. Wake Forest has referred to the procedure as IPHC.

abdomen is massaged to assure complete perfusion of the fluid throughout the cavity to kill all cancer cells. The cavity is then washed with fresh carrier solution to flush out the chemotherapeutic agent.

The Wake Forest IPHC protocol called for the use of one of two chemotherapy drugs, either Mitomycin C or Oxaliplatin. The carrier solution specified for Mitomycin C was a normal saline solution and for Oxaliplatin it was D5W, a solution of 5% dextrose—a form of sugar—in water. D5W was required because the drug manufacturer's insert accompanying the Oxaliplatin warned that "[a] final dilution must never be performed with a sodium chloride solution or other chloride-containing solutions", such as saline, because the drug is "incompatible" with them. Accordingly, the Wake Forest protocol specified that with Oxaliplatin, "[r]econstitution or final dilution must never be performed with a sodium chloride solution or other chloride-containing solutions."[5] The IPHC clinical-trial protocol was designed as a double-blind study to test the relative toxicity of the two drugs. Oxaliplatin was randomly selected for McKenzie-Thue's procedure at M.D. Anderson. Thus, the required carrier solution was D5W.

McKenzie-Thue's procedure lasted ten hours. During the first eight hours, Mansfield removed her spleen, her omentum, the lining of her left and right diaphragm, her gallbladder, and the ends of her small intestine and colon. Another surgeon performed a complete hysterectomy, removing her uterus, fallopian tubes, and ovaries, as well as a peritonectomy, stripping the lining of her pelvis. Then the chemotherapeutic perfusion began. The heated Oxaliplatin–D5W solution was pumped through McKenzie-Thue's peritoneal cavity for two hours, then flushed with the pure

---

[5] The Court mischaracterizes these mandates as suggestions. *Ante* at ___.

4

sugar water. The entire procedure went without a hitch, and Mansfield was hopeful that all had gone well. The McKenzies do not complain that any aspect of the procedure was performed below the standard of care.

But introducing so large a volume of D5W into the peritoneal cavity can lower sodium levels in the body, a condition called hyponatremia. Hyponatremia, in turn, can lead to edema—swelling from excess fluid trapped in the body. The anesthesiologist was aware of this risk and, consistent with the standard of care, took precautions to counteract it by starting saline and insulin IV drips prior to the introduction of the D5W. Nevertheless, McKenzie-Thue developed hyponatremia, resulting in an increased water level in her body, swelling of her brain stem, brain herniation, and death two days later.

Mansfield was shocked. He had treated 14 patients using the Wake Forest IPHC protocol, several using Oxaliplatin and D5W, without incident. There is no evidence that the IPHC procedure using Oxaliplatin and D5W ever caused the death of any patient other than McKenzie-Thue. When McKenzie-Thue's expert Miller was asked why McKenzie-Thue had such a tragic result, he testified only:

> [T]here's no way . . . I can know why Courtney died and other people don't other than her risk factors in that she had multiple hours of surgery debulking the tumor, multiple hours of anesthesia, then the . . . sugar water in her abdominal cavity at the end to . . . give her the chemotherapy.

> So, she is a unique person. I do not know what other people in other studies have had in terms of their experience around the time the chemotherapy is put into the abdominal cavity.

5

Other evidence suggests that McKenzie-Thue may have been more susceptible to cerebral edema because of her age and smaller size. The record does not reflect a more definite explanation.

M.D. Anderson had itself reviewed the Wake Forest IPHC protocol before approving it for use. Following McKenzie-Thue's death, M.D. Anderson and Wake Forest re-examined the protocol, and after discussions with the manufacturer of Oxaliplatin, concluded that the drug could be perfused using a normal saline solution rather than D5W.

**II**

**A**

The Texas Tort Claims Act waives governmental immunity in stated circumstances. Section 101.021 provides:

A governmental unit in the state is liable for:

   (1)    property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:

      (A)    the property damage, personal injury, or death arises from the operation or use of a motor-driven vehicle or motor-driven equipment; and

      (B)    the employee would be personally liable to the claimant according to Texas law; and

   (2)    personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.[6]

This case involves subdivision (2). The phrase "so caused" clearly refers back to "proximately caused" in subdivision (1), but it also incorporates the requirement of subdivision (1) that injury be

---

[6] TEX. CIV. PRAC. & REM. CODE § 101.021.

6

caused "by" a wrongful or negligent act or omission of the governmental unit, especially since the unit would not be liable, were it a private person, absent negligence or other wrong. The requirement also applies directly to the condition or use of property. It is not enough for liability that injury be caused by a use of property and, separately, an act of negligence. Subdivision (2) waives immunity from suit for an injury proximately caused by a negligent or wrongful use of property.

**B**

As easy as that rule is to say, it has been maddeningly difficult to apply.[7] In the first two decades of the Act's existence, we concluded that immunity had been waived in virtually every case that came before us whenever property was present. We held to be actionable claims of negligence for providing a post-operative patient a bed without rails,[8] for failing to provide a college football player a brace for his injured knee,[9] for failing to diagnose a heart attack from the results of an electrocardiogram,[10] and for taking an epileptic mental-health patient swimming while failing to provide him a life preserver.[11] During this period, we described the statutory language as "difficult

---

[7] Our efforts to apply Section 101.021 have had a "long and arduous history". *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996) (quoting *Univ. of Tex. Med. Branch v. York*, 871 S.W.2d 175, 177 (Tex. 1994)). Eighteen years ago I expressed the view "that it is simply impossible for the courts to meaningfully construe and consistently apply the use-of-property standard" in the statute. *Tex. Dep't of Criminal Justice v. Miller*, 51 S.W.3d 583, 591 (Tex. 2001) (Hecht, J., concurring).

[8] *Overton Mem'l Hosp. v. McGuire*, 518 S.W.2d 528, 529 (Tex. 1975) (per curiam).

[9] *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 300 (Tex. 1976).

[10] *Salcedo v. El Paso Hosp. Dist.*, 659 S.W.2d 30, 33 (Tex. 1983).

[11] *Robinson v. Cent. Tex. MHMR Ctr.*, 780 S.W.2d 169, 171 (Tex. 1989). In the only claim we found not to be actionable, the plaintiff alleged use of tangible personal property by a third party, not by the government. *See Beggs v. Tex. Dep't of Mental Health and Mental Retardation*, 496 S.W.2d 252, 253–254 (Tex. App.—San Antonio 1973, writ ref'd) (after another patient doused the plaintiff with lighter fluid and ignited it, the plaintiff alleged that the defendant state agencies were negligent in transferring a dangerous patient to the nursing home where the plaintiff resided).

to understand"[12] and "troublesome"[13] and made repeated, unanswered pleas for legislative clarification.[14] The Court eventually opined that the Legislature's silence amounted to approval of our having "interpreted the Act broadly"[15]—an inference belied by the fact that "waiver of governmental immunity is a controversial political issue"[16] and by the legislative compromises necessary to get the Act passed in the first place.[17]

The jurisprudential tide began turning in 1992. In *LeLeaux v. Hamshire–Fannett Independent School District*, we held that an injury that occurred on a parked school bus did not arise out of the use of the bus.[18] "[T]he bus [was] only the setting for the injury".[19] Several months later, in *Texas Department of Mental Health and Mental Retardation v. Petty*, five members of the Court concluded that the Act waives immunity for a claim based on the state's having continually misdiagnosed a mental patient over the course of several decades.[20] But the lead opinion for the Court attracted only

---

[12] *Lowe*, 540 S.W.2d at 301 (Greenhill, C.J., concurring).

[13] *Salcedo*, 659 S.W.2d at 32.

[14] *See Robinson*, 780 S.W.2d at 170; *Salcedo*, 659 S.W.2d at 32; *Lowe*, 540 S.W.2d at 303 (Greenhill, C.J., concurring).

[15] *Robinson*, 780 S.W.2d at 170; *see id.* at 170–171 (opining that the Legislature's having amended and codified the waiver provision without addressing the Court's concerns "indicates a legislative adoption of the construction given in [*Lowe* and *Salcedo*]").

[16] *Id.* at 173 (Hecht, J., dissenting).

[17] *See Tex. Dep't of Mental Health & Mental Retardation v. Petty*, 848 S.W.2d 680, 686 (Tex. 1992) (Cornyn, J., dissenting); *Robinson*, 780 S.W.2d at 175 (Hecht, J., dissenting) (both recounting the legislative history of the Act).

[18] 835 S.W.2d 49, 52 (Tex. 1992).

[19] *Id.*

[20] 848 S.W.2d at 681.

a plurality.[21] In dissent, Justice Cornyn warned that the Court's interpretation of the use-of-property standard had veered off course, was undermining the Legislature's intent to enact only a limited waiver of immunity, and had spawned "patently inconsistent results" in the lower courts.[22]

Within a few years, the Court had fully retreated from its initial, broad construction of the Act. In *University of Texas Medical Branch at Galveston v. York*, we held that immunity was not waived for a claim of negligence in failing to diagnose a broken hip—or, put another way, "for negligence involving the use, misuse, or nonuse of medical information."[23] We acknowledged our departure from *Petty* but explained that because *Petty* was a plurality opinion, it had "very limited precedential value", and "we [were] not bound by the result in that case".[24] We based our decision on the bedrock principle that "for the Legislature to waive sovereign immunity, it must do so by clear and unambiguous language",[25] and we reasoned that "the Legislature [had] not, by clear and unambiguous language, eliminated governmental immunity for injuries resulting from the misuse of information".[26] Later, we implicitly overruled our earlier decisions involving the football player

---

[21] Justice Cook concurred in the Court's judgment only, without providing any explanation. *Id.* at 685; *id.* at 685 (Cornyn, J., dissenting) ("The result [of the plurality opinion] is that no opinion speaks for the court.").

[22] *See id.* at 688–689 (Cornyn, J., dissenting).

[23] 871 S.W.2d 175, 176 (Tex. 1994).

[24] *Id.* at 176–177.

[25] *Id.* at 177 (citing *Duhart v. State*, 610 S.W.2d 740, 742 (Tex. 1980)).

[26] *Id.* at 179.

who was not provided a knee brace, the epileptic swimmer who was not provided a life preserver, and the undiagnosed heart attack, stating that each was limited to its facts.[27]

<h1>C</h1>

*York*'s precept—that a waiver of sovereign immunity must be by clear and unambiguous language—has been codified by the Legislature: "[A] statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language."[28] Two other principles are equally fundamental.

One, as Justice Cornyn reminded in *Petty*, is that the Act's waiver is limited.[29] In *Dallas County Mental Health & Mental Retardation v. Bossley*, we stated, "[O]ne thing is clear: the waiver of immunity in the Tort Claims Act is not, and was not intended to be, complete. Arguments for applications of the Act that would essentially result in its waiver becoming absolute must therefore be rejected as contrary to the Act's fundamental purpose."[30] We applied this principle in the medical context in *Kerrville State Hospital v. Clark*. There, the plaintiffs' daughter was murdered by her estranged husband while he was undergoing a course of outpatient mental-health treatment at the

---

[27] *See Dall. Cty. Mental Health & Mental Retardation v. Bossley*, 968 S.W.2d 339, 342 (Tex. 1998) ("The decision in *Salcedo* [the undiagnosed heart attack case] is limited to its facts."); *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 585 (Tex. 1996) (explaining that *Lowe*, the football player case, and *Robinson*, the epileptic swimmer case, "represent perhaps the outer bounds of what we have defined as use of tangible personal property" and that their "precedential value . . . is . . . limited to claims in which a plaintiff alleges that a state actor has provided property that lacks an integral safety component and that the lack of this integral component led to the plaintiff's injuries").

[28] TEX. GOV'T CODE § 311.034.

[29] *Tex. Dep't of Mental Health & Mental Retardation v. Petty*, 848 S.W.2d 680, 688 (Tex. 1992) (Cornyn, J., dissenting) (quoting *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 301–302 (Tex. 1976) (Greenhill, C.J., concurring)).

[30] 968 S.W.2d at 342.

Kerrville State Hospital.[31] The plaintiffs alleged that the hospital was negligent in giving the husband an oral form of medication to take on his own outside the hospital—which he failed to do—rather than administering to him an available injectionable form on site.[32] In sum, the plaintiffs' claim was "that the treatment prescribed to [the husband] was not as effective as an alternative method of treatment would have been."[33] We "[held] that [the hospital's] failure to administer an injectionable drug [was] non-use of tangible personal property and therefore [did] not fall under the waiver provisions of the Act."[34] To conclude otherwise, we said, would be "contrary to the limited waiver the Legislature clearly intended."[35]

The Court today states that "[u]nder our reasoning in *Kerrville*," the McKenzies' allegation that M.D. Anderson should have used a different carrier solution than D5W "is sufficient to waive immunity."[36] The Court's argument runs like this:

- *Kerrville* holds that non-use of property is not use for waiver of immunity.[37]

---

[31] 923 S.W.2d at 583.

[32] *Id.* at 584.

[33] *Id.* at 585.

[34] *Id.* at 584.

[35] *Id.* at 585.

[36] *Ante* at __.

[37] "*Kerrville* involved the distinction between use and non-use of property . . . . This distinction—that the property actually used (the oral form of the drug) did not cause the injury at issue—is what rendered the waiver for injuries caused by the use of tangible personal property inapplicable." *Ante* at ___.

11

- The McKenzies do not allege non-use, but rather, the non-negligent use of property that should not have been used.[38]

- *Kerrville*'s holding does not preclude the McKenzies' claim.

- Therefore, *Kerrville* allows the McKenzies' claim.[39]

The Court charges that "[t]he dissent . . . ignores" *Kerrville*'s reasoning that non-use is not use.[40] To the contrary, I embrace it. Here is *Kerrville*'s reasoning, which the Court ignores:

> There cannot be waiver of sovereign immunity in every case in which medical treatment is provided by a public facility. Doctors in state medical facilities use some form of tangible personal property nearly every time they treat a patient. Because of this fact, a patient suing for negligence could always complain that a different form of treatment than the one employed would have been more effective and still claim waiver under the Act. If such a complaint were enough to constitute the use of tangible personal property under the Act, the doctrine of sovereign immunity would be rendered a nullity.[41]

*Kerrville*'s fundamental rationale and today's holding are irreconcilable.

Another fundamental principle for construing the Act follows from *Kerrville*: the Act does not waive immunity for an exercise of judgment—in the healthcare context, for medical judgment. In *Texas Department of Criminal Justice v. Miller*, the defendant failed to diagnose an inmate with meningitis, from which he died.[42] The plaintiff alleged that the defendant had been negligent in administering to the inmate medications that treated his symptoms but masked the true nature of his

---

[38] "By contrast, here the McKenzies allege and have presented evidence that [M.D. Anderson] used property (the D5W) that should not have been used *and* that the D5W is what harmed Courtney." *Ante* at ___.

[39] "Under our reasoning in *Kerrville*, this is sufficient to waive immunity." *Ante* at ___.

[40] *Ante* at ___ n.8.

[41] *Kerrville*, 923 S.W.2d at 585–586.

[42] 51 S.W.3d 583, 585 (Tex. 2001).

12

illness.[43] We agreed with the defendant's argument that the plaintiff "alleged only the non-use of tangible personal property *and an error in medical judgment, neither of which are within the statutory waiver.*"[44] Quoting the passage from *Kerrville* above, we explained that our holding comported with the Legislature's intent that the immunity waiver be limited.[45]

The rule that an error in medical judgment, alone, is not within the Act's waiver is traceable to one of our earliest decisions, where Chief Justice Greenhill opined in a concurring opinion that a claim based on a doctor's removing the wrong kidney would not fall within the statutory waiver of immunity.[46] We adopted it expressly in *York* when we held that the Act does not waive immunity "from liability for negligence involving the use, misuse, or nonuse of medical information" and simultaneously disavowed our prior decision in *Petty*.[47] And it is consistent with our decision in *Kerrville* that a hospital's prescribing one form of medication over another potentially more effective form is not actionable under the Tort Claims Act.[48] None of our subsequent decisions have backed away from this principle or even muddied the waters. Because the McKenzies' negligence claim

---

[43] *See id.*

[44] *Id.* at 588 (emphasis added).

[45] *Id.* (quoting and paraphrasing *Kerrville*, 923 S.W.2d at 585–586).

[46] *Lowe v. Tex. Tech Univ.*, 540 S.W.2d 297, 303 (Tex. 1976) (Greenhill, C.J., concurring); *see Kamel v. Univ. of Tex. Health Science Ctr. at Hous.*, 333 S.W.3d 676, 686 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (holding that a claim against a doctor for removing the plaintiff's testicle during surgery, when the testicle later turned out to be healthy, did not fall within the statutory waiver of immunity in Section 101.021(2)) ("Kamel has made no claim that the surgical instruments themselves were defective in any way or that they were used in a negligent manner. Rather, the crux of Kamel's argument is that Dr. Wang made an erroneous medical judgment in determining that Kamel's testicle needed to be removed.").

[47] *Univ. of Tex. Med. Branch at Galveston v. York*, 871 S.W.2d 175, 176–177 (Tex. 1994).

[48] *Kerrville State Hosp. v. Clark*, 923 S.W.2d 582, 584 (Tex. 1996).

centers on M.D. Anderson's decision to use D5W rather than a different carrier solution during the clinical-trial protocol—not the manner in which M.D. Anderson administered the D5W—the medical-judgment limitation established in our caselaw is fatal to the McKenzies' case.

## D

In the case before us, Section 101.021(2) must be applied in light of these three principles: there is no waiver except by clear and unambiguous language, any waiver must be limited, and immunity from suit for medical judgments is not waived.

The McKenzies admit, and the Court agrees, that there was nothing improper in the way sugar water was used in the IPHC procedure. The McKenzies' claim is that sugar water "should not have been used at all".[49] And as the Court states, "absent the use of that particular carrier agent"— *i.e.*, sugar water—McKenzie-Thue's "injury would not have occurred."[50] That is probably true. Although the surgical procedure was long and invasive, nothing in the evidence suggests McKenzie-Thue would not have fully recovered and, perhaps, been freed of cancer. There is evidence to support the claim that the surgical protocol need not have called for the use of sugar water as the carrier solution to the extent it did. After McKenzie-Thue's death, M.D. Anderson's and Wake Forest's re-examination of the IPHC protocol concluded that a saline solution could be used with Oxaliplatin, at least in part, and the drug manufacturer changed its requirement that only sugar water be used. But all of this is information, not property.

---

[49] *Ante* at ___.

[50] *Ante* at ___.

But it is absolutely true that, absent the use of sugar water, McKenzie-Thue could not have had the IPHC procedure. At the time of McKenzie-Thue's procedure, the IPHC protocol prescribed that Oxaliplatin be perfused in solution with sugar water. Sugar water was no more a cause of McKenzie-Thue's death than was the use of Oxaliplatin, which was determined by random selection in the double-blind clinical trial. The McKenzies' complaint—that sugar water should not have been used at all—is tantamount to a complaint that the procedure should never have been performed at all. But that was clearly a medical judgment, for which the Court acknowledges immunity was not waived. The Court argues that following surgical protocol "does not somehow negate any negligence in using the property in the first instance."[51] That's true, of course, but following protocol involves the use of property; deciding to follow protocol does not.

The Court explains that its decision is really narrow:

[N]ot every tort claim involving medical providers will arise from the improper use of tangible personal property that causes harm. As discussed, a patient cannot merely allege that a medical provider used tangible personal property during treatment; the patient must also demonstrate that the use of the particular property at issue was both improper under the circumstances and caused injury.[52]

But not to be repetitive, the Court ignores what it said in *Kerrville*:

There cannot be waiver of sovereign immunity in every case in which medical treatment is provided by a public facility. Doctors in state medical facilities use some form of tangible personal property nearly every time they treat a patient. Because of this fact, a patient suing for negligence could always complain that a different form of treatment than the one employed would have been more effective and still claim waiver under the Act. If such a complaint were enough to constitute the use of

---

[51] *Ante* at ___.

[52] *Ante* at ___ (internal citations omitted).

15

tangible personal property under the Act, the doctrine of sovereign immunity would be rendered a nullity.[53]

The Court attempts to distinguish *Kamel v. University of Texas Health Science Center at Houston*,[54] a case the McKenzies more candidly acknowledge is contrary to their position. There, a surgeon performed a hydrocelectomy—a removal of fluid around the testicle.[55] But during the surgery, the surgeon decided the testicle looked cancerous and removed it altogether.[56] Later tests showed that there was no cancer in the testicle.[57] The patient sued, claiming that his injury was caused by the use of property—a scalpel and other surgical instruments.[58] The Court rejects that argument: "[T]he negligence complained of", it says, "was the surgeon's decision to remove the testicle, not his choice of property to accomplish that task."[59] So in the present case, the decision was not whether to use sugar water; its use was prescribed by the IPHC surgical protocol. The decision was whether to perform the IPHC procedure. That decision involved the use of a scalpel and sugar water. In the Court's view, M.D. Anderson's immunity was waived by the second but not the first. Under *Kamel*'s reasoning, immunity was waived by neither.

---

[53] *See supra* note __.

[54] 333 S.W.3d 676 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

[55] *Id.* at 679.

[56] *Id.*

[57] *Id.*

[58] *Id.* at 680.

[59] *Ante* at ___.

16

Similarly, in *University of Texas Health Science Center at Tyler v. Smith*, the court of appeals rejected a claim that a bile leak following gallbladder surgery was caused by the use of the electrocautery instrument used in the surgery.[60] As in this case, there was no evidence or even a claim that the use of the instrument was itself negligent.[61] The court concluded that the plaintiff's injury was the result of the medical judgment to perform surgery, for which immunity was not waived, and "use of the electrocautery instrument to remove the gallbladder did nothing more than furnish the condition that made the bile leak possible."[62]

The Court relies on *University of Texas M.D. Anderson Cancer Center v. Jones*.[63] There, the plaintiff volunteered to participate in a blind study to determine which of two drugs better helped people quit smoking.[64] The drug randomly chosen for the plaintiff was one she had taken before.[65] She told the study's candidate screener she had suffered an adverse reaction from the drug, but she nevertheless was instructed to take the drug, and she suffered the same adverse reaction as before.[66] The court of appeals held that the use of the drug waived immunity.[67] Regardless of whether the case was decided correctly, the present case is different. In *Jones*, M.D. Anderson knew that the plaintiff

---

[60] No. 12-18-00270-CV, 2019 WL 1960251, at *3 (Tex. App.—Tyler Apr. 30, 2019, no pet. h.) (mem. op.).

[61] *Id.*

[62] *Id.*

[63] 485 S.W.3d 145 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

[64] *Id.* at 147.

[65] *Id.*

[66] *See id.*

[67] *Id.*

17

had suffered an adverse reaction to a drug but prescribed it for her anyway, and she developed the same reaction. The clinical study was about the drug itself. In the present case, M.D. Anderson knew of the risk of hyponatremia from using sugar water, but also knew those risks could be managed and that no one had ever died from its use in the procedure. The decision whether to perform the IPHC procedure—a lengthy, very invasive surgery involving a complete cleansing of cancer from the peritoneal cavity—was not about whether to use sugar water but rather about whether the procedure could cure McKenzie-Thue of cancer.

The Court argues that its conclusion is unavoidable. To treat the claim here as complaining of a medical judgment, the Court says, would nullify the waiver of immunity altogether. To "separate the decision to use particular property from the subsequent physical manipulation of the property", the Court asserts, "would effectively write the use-of-property waiver out of the statute."[68] This is simply untrue. Had the sugar water been used in a negligent manner, no one argues that immunity would not be waived. The reality is that no healthcare provider makes a medical judgment to use property negligently in treating a patient. The medical judgment is to treat; negligence is a misstep. One would hope that such missteps are indeed rare and that the statutory waiver need only be narrow. By objecting to the dissent's narrow waiver, the Court implicitly concedes that its waiver is broad, and that directly conflicts with our cases. Even if the Court's analysis were reasonable, it is not required by any clear and unambiguous language of Section 101.021(2). The statutory text does not require so broad a waiver of immunity in conflict with the rule that immunity is not waived for medical judgments.

---

[68] *Ante* at ___ (emphasis omitted).

18

The Court gets one thing exactly right: "[T]he dissent would hold that causing harm by improperly administering the right property does not involve medical judgment and thus constitutes negligent or wrongful use of property under the Act's use waiver, while causing harm by properly administering the wrong property does involve medical judgment and thus cannot be negligent use under the Act."[69] That is true. And the reason is that using property in treatment improperly is a negligent use for which the Act waives immunity, while choosing an improper treatment that involves the use of property is not within the Act's waiver.

I would hold that the McKenzies' claim does not assert a use of property for which Section 101.021(2) waives immunity.

## III

Section 101.021(2) waives immunity only for a negligent or wrongful use of property that proximately causes injury.

> In order for it to be said that an injury proximately resulted from an act of negligence, the evidence must justify the conclusion that such injury was the natural and probable result thereof. In order to justify such a conclusion, the evidence must justify a finding that the party committing the negligent act ought to have foreseen the consequences thereof in the light of the attendant circumstances.[70]

The McKenzies' expert, Dr. Miller, clearly testified that McKenzie-Thue's death was not foreseeable. The Court explains that his statement must not be "divorced from its context."[71] Here is the context, as set out by the Court:

---

[69] *Ante* at ___.

[70] *Snellenberger v. Rodriguez*, 760 S.W.2d 237, 238 (Tex. 1988) (quoting *Carey v. Pure Distrib. Corp.*, 124 S.W.2d 847, 849 (Tex. 1939)).

[71] *Ante* at ___.

19

Q:     [Do] you believe that Courtney's death at M.D. Anderson was foreseeable to the doctors there?

A:     Oh I don't think [it was] foreseeable. I think that with her—the use of that amount of sugar water, that it was a possibility; but I don't think it was predictable.

Q:     They didn't expect her to die?

A:     No. Not—

Q:     But it was definitely a risk?

A:     It was a risk, yes, or severe neurological damage, permanent— permanent damage.

Q:     And according to [the expert witness designation], they were well aware of that risk?

A:     Yes.[72]

Read in context, Miller clearly, affirmatively testified that McKenzie-Thue's death was merely a possibility and was not predictable or foreseeable.

The Court states that "[f]oreseeability does not necessarily equate to predictability. Rather, 'foreseeability' means that the actor should have reasonably anticipated the dangers that his negligent conduct created for others."[73] But by "dangers" the Court means risks, not injuries. Miller testified that M.D. Anderson could not have reasonably anticipated McKenzie-Thue's death, but it knew very well the risks associated with injecting sugar water into McKenzie-Thue's body. Indeed,

---

[72] *Ante* at ___ (second and third alterations in original).

[73] *Ante* at ___.

it took steps, which Miller testified were proper, to avoid the risks. Those steps were, for reasons he could not explain, sadly ineffective.

So the Court reasons that if a healthcare provider knows the risks of treatment—as it always should—and takes steps to minimize those risks—again, as it always should—but injury occurs, the provider's administration of the treatment proximately caused the injury. This is nothing less than strict liability for any injury that occurs. The Court makes no bones about it:

> It is . . . clear that, at a minimum, the general dangers associated with the use of the D5W were known to Courtney's doctors. This evidence is sufficient to raise a fact issue on foreseeability.[74]

There are always risks to surgery. They may be so great that a procedure cannot be justified. That was not true for McKenzie-Thue. Mansfield thought she was a good candidate for the IPHC procedure. Miller testified that Mansfield's treatment of her was completely within the standard of care. He had successfully performed the procedure many times, several using Oxaliplatin and sugar water. M.D. Anderson should have foreseen the risks, and it did. Miller is right: it could not have foreseen her death.

The Court chides that the dissent "mischaracterizes not only our analysis, but the fundamentals of tort law" because it "has overlooked the fact" that the issue here is immunity not liability.[75] What the Court does not acknowledge is that the standard for proximate cause is the same in any context, whether determining immunity or liability. Of course, the Court offers, "we certainly recognize that the actions taken by [M.D. Anderson] to address the risk inherent in using the D5W

---

[74] *Ante* at ___.

[75] *Ante* at ___.

21

are relevant to both negligence and causation" and "hold only that these actions do not conclusively negate foreseeability".[76] That is precisely the point. The Court holds that if treatment involves risks (as it almost always does), and a healthcare provider recognizes them and does everything within the standard of care to avoid injury (as it certainly should and did here), yet injury still occurs (which had never happened before and was therefore highly improbable), and the unchallenged evidence from the plaintiffs' own expert is that the injury was not foreseeable (as Dr. Miller testified), then that evidence is sufficient for liability. I disagree. As far-reaching as today's decision on immunity will be, the Court's proximate cause analysis will affect, in its words, "the fundamentals of tort law."

*        *        *        *        *

I would reverse and render. Today's decision greatly expands the Tort Claims Act's waiver of immunity, contrary to our caselaw. And it fundamentally alters the concept of proximate causation. I respectfully dissent.

_____

Nathan L. Hecht
Chief Justice

Opinion delivered: June 28, 2019

---

[76] *Ante* at ___.